STATE OF MAINE                              SUPERIOR COURT
CUMBERLAND, ss                             CIVIL ACTION
                                           DOCKET NO.: CV-24-446

| | |
|---|---|
| AMANDA HOWLAND, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| ELLEVET SCIENCES, INC. | ) |
| | ) |
| And | ) |
| | ) |
| CHRISTIAN KJAER, | ) |
| | ) |
| Defendants | ) |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Now comes Plaintiff Amanda Howland and files this Complaint and Demand for Jury Trial ("Complaint") against Defendants ElleVet Sciences, Inc. and Christian Kjaer (collectively "Defendants") as follows.

## PARTIES

1.      Plaintiff Amanda Howland ("Plaintiff") is an individual who at all times relevant to this litigation has resided in Cape Elizabeth, Cumberland County, Maine.

2.      Defendant ElleVet Sciences, Inc. ("ElleVet" or the "Company") is a Delaware corporation with its principal place of business in Cumberland County, Maine.

3.      Defendant Christian Kjaer ("Kjaer") is an individual who at all times relevant to this litigation resided in Cape Elizabeth, Cumberland County, Maine.

1

## VENUE, JURISDICTION AND COMPLIANCE WITH CONDITIONS PRECEDENT

4.      Venue in this Court is proper pursuant to 14 M.R.S. § 501, because, as is set forth herein, Cumberland County, Maine is the county where the events giving rise to Plaintiff's causes of action occurred.

5.      As set forth herein, this Court has personal and subject matter jurisdiction over the parties as the events giving rise to this civil action occurred within Cumberland County in the State of Maine.

6.      On or about March 13, 2024, Plaintiff filed her initial Complaint of Discrimination with the Maine Human Rights Commission (the "MHRC") against Defendants captioned *Howland v. ElleVet Sciences, Inc., et al.*, E24-0096-A, -B and -C. Therein, Plaintiff indicated that she was making employment discrimination claims based upon sex and physical or mental disability. She also indicated that she was making employment retaliation claims based upon whistleblowers' retaliation and Maine Human Rights Act ("MHRA") retaliation. Plaintiff filed an Amended Complaint (asserting these same claims) with the MHRC on or about August 26, 2024. Plaintiff requested that both her Complaint and her Amended Complaint be dual filed with the U.S. Equal Employment Opportunity Commission ("EEOC").

7.      On or about October 24, 2024, the MHRC issued Plaintiff a right-to-sue letter. 5 M.R.S. §§ 4612(6); 4622(1)(C). On or about November 1, 2024, the EEOC issued Plaintiff a right-to-sue letter.

8.      Plaintiff has complied with all conditions precedent to the maintenance of the instant civil action.

## RELEVANT BACKGROUND FACTS

9.      Plaintiff is ElleVet's creator and founder.

2

10. Until January 1, 2024, ElleVet was a Delaware limited liability company managed by a Board of Managers consisting of Plaintiff, Kjaer and Michael Williams ("Williams"). As of January 1, 2024, ElleVet became a Delaware corporation and Plaintiff, Kjaer and Williams became the Company's three Directors. Plaintiff, Kjaer and Intellivet Capital Partners LLC (owned by Williams and his partner Fred Metzger) are the sole owners of Portland Technology Holdings, LLC, which in turn owns 100% of ElleVet.

11. After founding ElleVet, Plaintiff gave Kjaer the opportunity to be an equity owner and the Company's Chief Executive Officer ("CEO").

12. Plaintiff and Kjaer were in a personal relationship around that time.

13. In 2019, Plaintiff ended her personal relationship with Kjaer. Kjaer got mad at Plaintiff, refused to speak to her at work for extended periods of time and took steps to oust her from her own Company.

14. Kjaer attempted to get Plaintiff to sign a release waiving all claims in exchange for a modest severance package. He told her that doing so would be a great deal for her and that he was doing her a favor by offering her severance.

15. Prior to that, without Plaintiff's knowledge, Kjaer and Williams set up other companies to divert business and revenue from ElleVet in hopes of reaping significant profits for themselves and not for Plaintiff.

16. Had Plaintiff executed the release that Kjaer wanted her to sign, she unknowingly would have released all claims that she had and thus, Kjaer and Williams effectively would have successfully deprived her of a significant portion of ElleVet and related businesses and any associated profits, which was their plan.

17.     When Plaintiff refused to sign the release, Kjaer and Williams terminated her employment, kicking her out of the company that she founded. Kjaer also had ElleVet's counsel continue to pressure Plaintiff to sign the release.

18.     When Plaintiff began to uncover some of the things that Kjaer and Williams had been doing, including setting up other entities and other revenue streams that they hid form Plaintiff, Kjaer aggressively gaslighted her, telling her she was wrong and that they had not done the things she suspected them of doing to cut her out of the business.

19.     This was extremely traumatizing to Plaintiff because by that time, she had additional evidence of Kjaer and Williams' wrongdoing. She could not comprehend how Kjaer, who had said he loved her, would try to cut her out of the business that she founded and then blatantly lie about what he had done.

20.     Plaintiff shared with Kjaer how badly his betrayal and his lies had hurt her and how unbearable the trauma was. ElleVet was her life's passion and her financial security and this was being done by a man who had led her to believe that he cared deeply about her.

21.     Initially, Kjaer doubled down, again telling Plaintiff that she was crazy for thinking that he and Williams had cheated her.

22.     With no other recourse, Plaintiff started a lawsuit. As litigation progressed and it became clear that his activities would be revealed, Kjaer confessed all to Plaintiff, acknowledging his betrayal and asking for her forgiveness.

23.     Kjaer blamed it all on Williams, saying that he had been naive by trusting Williams, that Williams was of bad character and had led him (Kjaer) astray. Kjaer also told Plaintiff he would never hurt her again, that he had learned his lesson and that she could trust him going forward.

4

24. Kjaer repeatedly told Plaintiff that he loved her, that he had lost his way and had learned from his mistakes and that nothing like this would ever happen again.

25. Kjaer also told her that he wanted her back in the Company, that she could come back to work at ElleVet, and they would be true partners.

26. Plaintiff believed the things he said, in part because she very much wanted to return to the Company and in part because she wanted to believe that Kjaer would do right by her going forward.

27. Plaintiff agreed to settle her lawsuit in exchange for various considerations, including her reinstatement as ElleVet's Chief Creative Officer ("CCO").

28. At all times relevant herein after her reinstatement, Plaintiff was employed by ElleVet and its successor, the Delaware corporation, until her employment was unlawfully terminated effective January 22, 2024.

29. Because Kjaer appeared to be taking personal responsibility for the terrible things he had done and he adamantly told Plaintiff that he would do right by her going forward, Plaintiff agreed to rekindle her personal relationship with him.

30. Kjaer convinced Plaintiff that he loved her, to the point where she agreed to buy a house with him, which they did in 2021.

31. Subsequently, however, in April and May of 2023, Kjaer started pushing to decrease Plaintiff's authority at ElleVet. Kjaer did not like Plaintiff holding him accountable for his decisions or disagreeing with him when she thought his decisions were not in ElleVet's best interests.

32. Kjaer told Plaintiff that he still cared about her, that she would continue to be CCO and that she would still be involved in the Company matters that were important to her and that, in his words, she was "excellent at."

33. To further reassure her, Kjaer repeatedly said that Plaintiff was the "brains of the company" and that "all the best ideas" came from her.

34. However, Kjaer said that Plaintiff could not have management authority over other ElleVet employees, which was a significant reduction in her role. He was adamant that she needed to agree to his proposed change to her job duties and that it needed to take effect right away.

35. As a driving reason for requiring Plaintiff's immediate removal as a manager, Kjaer indicated that her direct report, Employee K, had come to him in tears saying that she could not work with Plaintiff and that she would quit if something was not done right away.

36. Plaintiff agreed to step back as a manager, relying on Kjaer's representations about his interactions with Employee K. However, Plaintiff insisted that she and Kjaer enter into an agreement that specifically outlined each of their roles vis-a-vis the Company and each other. In that agreement, dated May 19, 2023 (the "May Agreement"), Kjaer agreed to answer Plaintiff's questions about ElleVet matters during one-on-one meetings between them, that she would remain actively involved in the Company as CCO (to do the work, in his words, that only she could do) and that she would still be involved in the Company matters that were important to her.

37. At Kjaer's insistence, as part of the May Agreement, Plaintiff reaffirmed that he was the Company's CEO and had the right to direct and control the business, that she reported to him, that he was her supervisor and that she was subject to his direction, as is typical in an employment relationship.

6

38.     In the May Agreement, Kjaer also emphasized that he had the right to set the rules that Plaintiff needed to follow at work, including who she could and could not talk to and what she could and could not do.

39.     The May Agreement reflected the reality of Kjaer's status as CEO and Plaintiff's status as a subordinate – i.e., that they were not on equal footing despite being co-owners of ElleVet.

40.     During this period, Plaintiff also shared with Kjaer how hurtful the way he went about forcing this change in her role was to her and how it triggered the same feelings and fears she experienced when he previously lied and attempted to cut her out of the Company.

41.     Kjaer assured her that was not happening here, that she did not need to worry and that she was critical to ElleVet's success.

42.     Plaintiff was also upset because she had long been advocating that they work together with an executive coach, but Kjaer consistently and repeatedly refused to do so. She felt she was now paying the price, because the change in her role resulted from his unwillingness to work on how they communicated and his own limitations as a leader, and she had never been told what her shortcomings were as a manager and been provided with an opportunity to improve.

43.     Plaintiff also shared with Kjaer her strong fear of again being gaslighted by him and of again being marginalized and forced out of the Company by him. Plaintiff told Kjaer that it would be "soul destroying" if he did those things to her again.

44.     Kjaer promised her that those things would not happen again. He told her that he cared about her, and he promised again that he would not hurt her like he had before.

45.     Plaintiff also shared with Kjaer that because of the trauma she experienced as a result of his past betrayal, she had been diagnosed with post-traumatic stress disorder ("PTSD").

7

46.     Soon after entering into the May Agreement, Plaintiff told Kjaer that she was committed to continuing to work together within the boundaries of their agreement but did not want to continue their personal relationship.

47.     In response, Kjaer pressured Plaintiff to continue their personal relationship. Plaintiff refused and rejected his advances for both physical and emotional intimacy.

48.     This made Kjaer extremely angry and after multiple rejections of his advances, he began to retaliate against Plaintiff at work, including by breaching their May Agreement.

49.     By way of example, Kjaer excluded Plaintiff from matters that she was to be included in under the May Agreement, including formulation of a new dosing chart and packaging (her participation was only allowed after intervention by counsel), hiring decisions, onboarding, new product initiatives, and other things clearly in her domain as ElleVet's CCO.

50.     Kjaer also started to exclude Plaintiff from Company dinners and outings that she had normally attended. For example, Kjaer excluded Plaintiff from dinner with a consultant that took place shortly after Plaintiff told Kjaer their relationship was over. Kjaer told Plaintiff he intentionally excluded her because they were "not getting along."

51.     Given the retaliatory restraints that Kjaer placed on Plaintiff and his abuse of his authority as CEO, described herein, Plaintiff has had little ability to influence the Company's business or operations. This is even more true given that, he has prevented her from receiving information about the Company both in her former role as its CCO and as a current member of its Board.

52.     Kjaer also started to gaslight Plaintiff again, telling her things that were not true, including telling her that she was not being excluded from work matters when clearly this was occurring.

8

53.     Kjaer also refused to provide Plaintiff with information she was entitled to and that she had asked for pursuant to their May Agreement. Often, Kjaer would pretend that he could not remember the answer when Plaintiff asked for information, or he would simply refuse to answer her questions about matters she had the right to inquire about pursuant to their May Agreement, and as the Company's CCO and as a Board manager.

54.     On multiple occasions, Kjaer would present an alternative and false reality to Plaintiff, for example, denying that certain conversations between them had ever occurred.

55.     At one point, despite the May Agreement's clear language, Kjaer told Plaintiff, with total disdain and hostility, that she had no right to <u>any</u> information and that he alone would decide what, if any, information he would share with her.

56.     On other occasions, Kjaer told Plaintiff that there was no information to share and that there had been no developments, only for her to subsequently learn that this was false and that things were happening in the areas in which she had previously been involved and in which she was still supposed to be involved under the terms of their May Agreement.

57.     On another occasion, Kjaer boasted to Plaintiff that the May Agreement was unenforceable.

58.     Despite knowing that this behavior both caused and exacerbated Plaintiff's PTSD, Kjaer aggressively and contemptuously engaged in it.

59.     Because of her PTSD and the effects his behavior was having on her, Plaintiff asked Kjaer not to do certain things, such as talk to her in a hostile and/or demeaning manner, or be dismissive of her, when alone and also when in front of others. Plaintiff also asked Kjaer to honor her need for a safe space in the house in which they jointly resided. Kjaer, however, did not change his behavior or otherwise do anything differently in response.

9

60. Kjaer also started to reprimand Plaintiff and threaten her position with ElleVet, stating that she was refusing to do work as instructed. These allegations were fabricated. In fact, in the only two instances Kjaer identified, it was Kjaer who failed to take the actions that were to precede Plaintiff's work. When this was pointed out, he claimed not to recall that and/or denied that the conversations about what he was supposed to do ever took place.

61. Kjaer also continued his manipulative behavior – for example, by telling Plaintiff to engage with someone on something, but then later reprimanding her for doing so and pretending that he never gave the original instruction.

62. Other employees told Plaintiff that Kjaer instructed them not to talk to her and/or to bypass her on things that she would normally handle for ElleVet. Employees were afraid of Kjaer's wrath if they were seen interacting with Plaintiff and on one occasion, an employee told Plaintiff that Kjaer became angry and publicly scolded her for engaging with Plaintiff. (This was despite the fact that the May Agreement stated clearly that Plaintiff would be working directly with staff.)

63. On several occasions, Plaintiff complained to Kjaer that he was retaliating against her because she ended their personal relationship and told him that he should not hold that against her at work. This made him even angrier.

64. Kjaer also continued to threaten Plaintiff's livelihood because he was angry with her for rejecting him and for complaining about his retaliation, in effect retaliating against her for complaining about his retaliation. Among other things, he embarked on a campaign to convince Williams, the Company's other manager, to terminate her Master Services Agreement with ElleVet, to terminate her role as the Company's CCO and to cut or eliminate her pay.

10

65.     Kjaer knew that his actions were causing Plaintiff horrible distress. He also knew that his threats would trigger and upset her as a single mother suffering from PTSD with a child at home dealing with serious personal struggles.

66.     Notwithstanding this, Kjaer continued to minimize Plaintiff's role at the Company, excluding her from things that she should have been involved in as CCO, again knowing this would exacerbate her PTSD and upset her greatly. Kjaer did not care that his actions were also contrary to ElleVet's best interests.

67.     Kjaer knew of Plaintiff's fears of him lying to and gaslighting her, of being marginalized by him and of losing her financial security. Kjaer knew that his actions were incredibly upsetting to Plaintiff and horrifically painful given her PTSD. However, he relentlessly persisted.

68.     In addition to the emotional stress and trauma he caused, Kjaer's actions caused Plaintiff physical pain and suffering, such as sleeplessness, nausea, uncontrolled physical shaking, bruises resulting from stress, broken blood vessels in her eyes from stress, bleeding of the gums, inability to eat, extreme headaches, anxiety attacks and other mental, emotional and physical trauma.

69.     Plaintiff had to seek medical treatment because of Kjaer's actions. Although she told him that his actions were hurting her, he persisted in his behavior.

70.     On two separate occasions when they were alone, Kjaer admitted that he had marginalized Plaintiff, that he had deliberately humiliated her in the eyes of others at the Company and that he had intentionally excluded her from things in which she should have been involved. Kjaer also admitted that he did so because "we were not getting along."

71.     Kjaer later lied – yet again – denying that he ever said these things.

11

72. Because they were no longer involved personally, Kjaer and Plaintiff had agreed they would list for their house for sale in September 2023, after Plaintiff's family was done vacationing together at the house in late August.

73. Angry at her for rejecting him and for her subsequent complaints about his retaliation, Kjaer then threatened legal action against Plaintiff, demanding she agree to list the house for sale earlier than discussed, knowing this would be incredibly upsetting to her given that her daughter was also in the house and was experiencing personal struggles.

74. In August 2023, despite their agreement to list the house in September, Kjaer filed a lawsuit against Plaintiff seeking to force the sale of the house and demanding that he get more than 50% of the sales proceeds.

75. Kjaer filed this action at the same time he told Plaintiff that he was (supposedly) trying to work with her to explore her purchasing his interest and while her family was visiting, knowing that filing the lawsuit at that time would hurt her the most.

76. In his lawsuit, Kjaer made blatantly false claims that he had paid more than his agreed to or "fair share" of expenses related to the house. He made this claim notwithstanding knowing that Plaintiff had paid $100,000 more towards the down payment along with numerous other expenses. (And despite knowing that in the previous two homes they had lived at together, Plaintiff had paid all the rent and expenses at one and had paid the mortgage and other expenses at the other.)

77. Since May 2023, Kjaer knew that Plaintiff was struggling with PTSD that his actions caused. He was also aware that she provided the Company with a doctor's note confirming her condition and requesting the accommodation of working from home.

12

78.    Kjaer used the excuse that Plaintiff was not in the office to exclude her from matters even though she could have easily participated by video conferencing, which many employees, including Kjaer, do frequently.

79.    Fearing for her safety given his unbridled hostility, Plaintiff stayed in the house's master bedroom area when Kjaer was home to avoid having to interact with him. Given her PTSD and his above-described horrific behavior, Plaintiff told Kjaer she did not feel safe being in the same space as him.

80.    Instead of staying out of Plaintiff's space, Kjaer's moved his things back into the master bedroom. (Previously Kjaer had being sleeping in the house's guest room.) Although Plaintiff pleaded with him to respect her safe space and to sleep elsewhere, he refused, despite knowing that he was causing her tremendous pain and anguish. He angrily told her, "This is my fucking house and I'll sleep wherever I want!"

81.    Kjaer also physically threatened Plaintiff, at one point telling her that he could drag her from the room any time he wanted to, making Plaintiff fear for her physical safety.

82.    As a result, Plaintiff had to move out of the master bedroom and stay upstairs to avoid Kjaer. She kept food and personal supplies in her upstairs room to avoid having to interact with him when he was home due to his anger and hostility. Plaintiff started keeping the door to her room locked when Kjaer was in the house because she felt so unsafe around him.

83.    Kjaer also became hostile to Plaintiff in workplace settings. At one ElleVet board meeting, he was so hostile in the way he looked at her, the way he spoke to her and the way he dismissed and demeaned her, that one of the attendees later asked if she was alright and shared how painful it was to observe Kjaer treating her that way.

13

84.     As another example, Plaintiff asked about plans for a product launch in a work meeting with various employees. Kjaer angrily asked Plaintiff what she meant by "product launch," despite having discussed the concept on multiple occasions.

85.     Kjaer repeatedly told Plaintiff that he had done nothing wrong, and that Plaintiff was making it all up in her head. This was despite having previously admitted that he was marginalizing her, was excluding her, was doing things that he knew were hurtful to her and that he knew what he was doing was wrong, all because he was angry with her.

86.     Kjaer also made decisions that he knew were not in ElleVet's best interest because he prioritized retaliating against Plaintiff over doing what was best for the Company. For example, prior to Plaintiff ending their relationship, Kjaer stated that the worst-case scenario for the Company would be for Kjaer and Employee K to oversee marketing without Plaintiff's involvement, which he said in part to assure Plaintiff that she would still be actively involved in the Company's marketing efforts. After Plaintiff ended their relationship, however, Kjaer cut her out of marketing and put in place his self-described worst-case scenario. Additionally, Kjaer refused to acknowledge that since removing Plaintiff from her role and not letting her do the things he previously acknowledged she was so good at, the Company has not performed nearly as well as it did when she was in place.

87.     Additionally, at times, Kjaer manufactured scenarios to make Plaintiff look bad, so that he could criticize and scapegoat her.

88.     For example, at one point, Employee K approached Plaintiff and shared that she missed working together and wanted to have a better working relationship. When Plaintiff agreed and stated that she wanted Employee K to feel safe to share anything that Plaintiff did that upset her, Employee K expressed confusion. When Plaintiff explained that Kjaer had shared that

14

Employee K came to him crying because she was so upset with the way Plaintiff treated her and that Plaintiff had been surprised because she thought they worked well together, Employee K said that she had no idea what Plaintiff was talking about and said that she never went crying to Kjaer. Plaintiff was stunned and horrified that the premise that Kjaer used to push her to enter into the May Agreement was yet another lie from him.

89.     Kjaer also behaved cruelly in their daily interactions at the house, knowing this would upset Plaintiff. He has been and continues to be very hostile in the way he talks to her; uses his size and personal space to intimidate her, and does whatever he can to make her miserable, such as refusing to clean up after himself or to help prepare the house for a showing for prospective buyers. (Ironically, despite having sued Plaintiff to try to force the house's sale.)

90.     Kjaer was also sexist in his interactions with Plaintiff. By way of example, he would tell her that she could not talk to people the way that he could because she was a woman. He also told her that because he was a man, he could get away with things that she could not, suggesting that even though he treated people badly at work, he could keep his job, while for doing less, she had to step down.

91.     Even though the language and intent of ElleVet's Operating Agreement was for the Company to make distributions to help cover tax obligations, Kjaer voted against the Company doing so, knowing that this would be a huge problem for Plaintiff financially.

92.     When Kjaer insisted that the parties each bring in their personal attorneys to help them reach an agreement on how to work together, Kjaer promised Plaintiff that since this was for the Company's benefit, ElleVet would pay each of their attorney's fees. Because of his anger and retaliatory bias, however, Kjaer reneged on his promise to having the Company pay Plaintiff's attorney fees, although he had ElleVet pay the attorney's fees he incurred. This is just another

15

example of his retaliatory behavior and was one in which he created additional financial exposure for Plaintiff which obviously was upsetting to her. Months later, after the intervention of counsel, Plaintiff's attorneys received partial payment, but that did not make up for the stress and upset that Plaintiff experienced after being told that she would have to pay the subject fees due to Kjaer reneging on his earlier promise.

93.    In late 2023, when ElleVet sought to hire a new Chief Financial Officer ("CFO") and a Chief Commercial Officer (a newly created role), Kjaer minimized Plaintiff's role and kept her out of the loop. When asked why she was not allowed to interview the new candidate for the Chief Commercial Officer role alone, he falsely told her, in part, it was because in the past, she failed to show up for scheduled interviews. When Plaintiff asked Kjaer for specific examples of this, he did not provide any. Plaintiff later learned that the Company made offers to both the CFO and the Chief Commercial Officer candidates before she had been informed that offers would be made or what their terms would be. (By contrast, Kjaer did discuss those things with Williams, ElleVet's other manager, in advance of the Company making the offers.)

94.    Almost every year, Plaintiff represented ElleVet at the Veterinary Meeting & Expo ("VMX") in order to promote the Company in the industry. Plaintiff planned to represent ElleVet at VMX in January 2024 to announce the merger of the ElleVet Project with the Street Dog Coalition (Plaintiff is President of the Board and also the founder of the ElleVet Project), to attend the ElleVet Scientific Advisory Board meeting, and to meet with various industry members. As a further act of retaliation, Kjaer denied Plaintiff permission to attend VMX, informing her that if she wanted to attend, she would have to arrange to do so on her own and incur all expenses personally.

16

95.    Plaintiff reported to Williams that Kjaer was using his position as ElleVet's CEO to retaliate against her because she refused to continue to have a personal and intimate relationship with him and that he retaliated further because he was angry about Plaintiff complaining about his acts of retaliation.

96.    Plaintiff also shared with Williams that Kjaer's actions were hurting Company revenue, providing specific examples.

97.    Williams acknowledged that Plaintiff's complaints about Kjaer were in keeping with Williams' knowledge of him and added, "that is what CEOs do, they retaliate." Williams said that Kjaer is "what we have got" for a CEO.

98.    Williams did not take any steps or other actions to address the mistreatment or otherwise attempt to hold Kjaer accountable for his behavior and breach of his responsibilities and of Company policies.

99.    Despite this, on several other occasions Plaintiff shared with Williams her concerns about Kjaer's acts of discrimination, harassment and retaliation directed at her. Williams still took no action, nor did he show any concern. Instead, Williams told Plaintiff that she should act more dispassionately and not show her emotions.

100.    Williams later commented that "it is clear the two of you cannot work together" and then began to actively pressure Plaintiff to accept a deal in which she would step down as ElleVet's CCO, agree to step out of daily operations and accept a Senior Advisor role.

101.    Plaintiff told Williams that she wanted to continue in her role as CCO so long as there were certain protections against Kjaer's behavior. She also told Williams that the only reason Kjaer could not work with her was because of his anger and retaliatory attitude toward her. Plaintiff told Williams that she should not be forced to leave the Company as a consequence.

102. Williams did nothing in response and refused Plaintiff's request to have an independent investigation of the complaints she made.

103. Previously, as CCO, Plaintiff was included on an approval matrix applicable to Company decisions. Subsequently, however, at a board meeting in November 2023, over her objection, Kjaer and Williams adopted a new approval matrix removing her from the decision-making process, thus further marginalizing her.

104. At no point did Williams indicate to Plaintiff that there was anything wrong with her job performance. Yet, he still pressured Plaintiff to step down as CCO. Similarly, Kjaer did not provide any specifics of anything Plaintiff did or failed to do that would justify terminating her as CCO or anything similar.

105. At no point did Kjaer or Williams ask Plaintiff for her side of the story regarding any aspect of her behavior or performance that they might now claim was a factor in their pressuring her to step down as CCO.

106. To the extent Kjaer or Williams might now claim that there were deficiencies in Plaintiff's performance or behavior justifying their pressuring her to step down as CCO, it would clearly be pretextual. Specifically, any reason offered now would be distinctly different from the original reason Williams provided. Additionally, since Williams and Kjaer started talking about removing her as CCO, no one ever informed Plaintiff of any specifics with respect to any alleged deficiencies in her performance or behavior or asked her to provide her side of the story.

107. Plaintiff has reported serious behavioral and performance concerns regarding Kjaer's actions as CEO, with clear and indisputable specifics, to Kjaer as CEO as well as to Kjaer and Williams as the other two Managers/Directors. Williams acknowledged many of the issues but did nothing to hold Kjaer accountable.

108. Knowing that his past actions had caused Plaintiff to suffer from PTSD and knowing the severe pain and suffering he would cause her, Kjaer has knowingly and maliciously adopted a pattern of emotional and mental abuse and gaslighting, aimed directly at Plaintiff by:

a. Retaliating against her because he was hurt and angry that she refused to continue their personal relationship and be intimate with him;

b. Retaliating against her further for complaining about his acts of retaliation;

c. Significantly marginalizing her CCO role at ElleVet and then attempting to (again) wrongly cut her out of the Company;

d. Intentionally withholding information from her to which she was entitled;

e. Pretending to have forgotten events and statements, and trying to make her believe she is misremembering matters and/or is crazy or incompetent;

f. Weaponizing their past relationship by claiming he is only looking out for her best interests when the opposite is true;

g. Shifting the blame onto Plaintiff by falsely claiming she has done things to deserve his terrible treatment;

h. Using her vulnerabilities against her and fueling her fears to cause her greater pain and suffering; and

i. Denying having caused her any pain and suffering when knowing full well that has been the intended purpose and the certain outcome of his actions.

109. A woman should not have to "sleep" with a man, her boss, to be able to keep her job, nor should a woman be treated even worse because she complains about being forced to make that choice. But that is what Plaintiff has been subjected to because of the discriminatory and retaliatory attitudes of both Kjaer and Williams.

110. On January 9, 2024, counsel for Plaintiff emailed a Notice of Claim to counsel for the Company and to Kjaer's personal counsel. The Notice of Claim included most of the information set forth herein, and specifically asserted that Plaintiff's rights had been violated under the MHRA, the Maine Whistleblower Protection Act ("MWPA"), Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), and the Americans with Disabilities Act ("ADA").

111. Upon information and belief, counsel for Kjaer and for ElleVet shared the Notice of Claim with Kjaer and Williams on January 9, 2024, or soon thereafter.

112. Nine days later – on January 18, 2024 – Kjaer sent an email to Plaintiff and Williams, attaching an agenda and proposed motions calling for the termination of Plaintiff's employment with ElleVet. These motions were to be considered at a Board meeting scheduled for January 22, 2024.

113. At the Board meeting on January 22, 2024, Plaintiff, Williams and Kjaer were all present, along with ElleVet's counsel. Plaintiff addressed the Board, stating that she wanted the Company to hire an outside investigator to conduct a fair and impartial investigation into the actions of the CEO of the Company as it related to her complaints already made known to Kjaer and Williams and to Company counsel, and to hold off voting to terminate her employment given that she felt the CEO's motion to terminate her employment was also motivated by his discriminatory and retaliatory bias.

114. Company counsel, Kjaer and Williams all ignored Plaintiff's request for an independent investigation of Kjaer's conduct. Kjaer and Williams then voted to terminate Plaintiff's employment with the Company.

115. This was a continuation and culmination of the discriminatory, harassing and retaliatory behavior of Kjaer, the Company and Williams.

116.    The termination of Plaintiff's employment has been even more traumatizing for her given that she founded the Company, was largely responsible for its success, is financially reliant on her ElleVet salary, and because the CEO who gaslighted her, lied about her to others and then forced her out because of his anger that she ended their relationship and complained about his retaliatory behavior orchestrated the entire scheme.

117.    The termination of Plaintiff's employment, with its immediate effect, also has been humiliating to Plaintiff given her abrupt disappearance from being active in the Company as its founder, CCO and a prominent member of its community.

118.    Among other painful aspects, Plaintiff was not given the opportunity to say goodbye to anyone at the Company she founded and her Company email was shut down even though she remains a member of the Board. ElleVet has also abruptly removed most references to Plaintiff from its website.

119.    At the Board meeting, Plaintiff asked that it be explained to her why they were voting to terminate of her employment. Kjaer told her it was because her CCO (Chief Creative Officer) position was no longer needed because the Company intended to hire a Chief Commercial Officer.

120.    That explanation is clear pretext because (i) Plaintiff had never been told that hrigin a Chief Commercial Officer (which is a different job description than Plaintiff's Chief Creative Officer position) would result in the elimination of her position in whole or in part, and (ii) it is a different reason than the one given by Williams as to why he thought Plaintiff should become a Senior Advisor as opposed to continuing as CCO, namely because he felt Plaintiff and Kjaer "do not get along."

21

121. Additionally, Plaintiff has not been offered a Senior Advisor position or any other role at the Company even though that was discussed previously.

122. For Kjaer, the real reason for terminating Plaintiff's employment and not offering her another role at the Company was his extreme hatred for and resentment of her because she continued to raise concerns about the ongoing retaliation and discrimination (including harassment) she was experiencing at his hands in his roles as ElleVet's CEO and as the Chair of its Board.

123. For Williams, the real reason for terminating her employment was that he did not believe Plaintiff and Kjaer could work together and therefore Plaintiff had to go, which of course is punishing Plaintiff for complaining about Kjaer's abusive, harassing, retaliatory and illegal behavior and is a form of discrimination and retaliation in its own right.

124. Upon information and belief, Plaintiff has not been paid all that she was entitled to receive following the termination of her employment and Kjaer's unwillingness to pay Plaintiff that to which she is entitled is motivated in whole or in part by his discriminatory and retaliatory attitude towards her. He continues to try to hurt her in every way that he can.

125. Additionally, Plaintiff and Kjaer were to be paid the same amount for their work for ElleVet. Upon information and belief, the Company paid Plaintiff less than Kjaer.

126. Since terminating Plaintiff's employment and following the filing of her Complaint with the MHRC and EEOC Kjaer and Williams have further marginalized Plaintiff's role as a member of the Board, by refusing to provide her with information that she is entitled to receive and by excluding her from discussions and input on matters that previously she would have been involved in as a member of the Board. Several requests for information to which Plaintiff is entitled to receive as an owner of the business and a member of the Board have been simply ignored.

22

127.    Effectively, Kjaer and Williams have denied Plaintiff any influence over the business. Kjaer and Williams are making decisions that are within the purview of the Board, without informing Plaintiff or giving her any chance for input, and then presenting them after the fact for a vote of the Board.

128.    One example, as noted above, was the hiring of the Company's Chief Commercial Officer. On February 12, 2023, Plaintiff received notice of a Board meeting to be held on February 26, 2023 in order to vote on the hire of a new Chief Commercial Officer.

129.    Prior to the meeting at which the vote as to occur, Plaintiff saw the following on the candidate's LinkedIn page:



130.    As is obvious from this post, as of the date that Plaintiff received the notice of the Board meeting, the candidate's employment terms had been established and the individual had been hired, all without Plaintiff having any knowledge or input. Clearly, the hiring of this individual was a Board matter, as evidenced by its inclusion on the Board agenda (and past practice), however, Kjaer and Williams decided the matter without giving Plaintiff any opportunity

24

to influence or participate in it because, by the time of the February 26 Board meeting, it was a "done deal."

131.    At the February 26 Board meeting, Plaintiff asked why she (but not Williams) had been excluded from the hiring process. She also asked why Kjaer believed it was acceptable to have the Board "reaffirm" the hiring and compensation package after ElleVet had entered into a binding employment agreement with the new Chief Commercial Officer. Kjaer offered no explanations.

132.    In addition to their active conscious discrimination, Plaintiff has been the victim of bias by both Kjaer and Williams, who by their words and actions have demonstrated an implicit prejudice against women and against Plaintiff in particular.

133.    Kjaer's actions in particular, but Williams' actions as well, have gravely impacted Plaintiff physically, emotionally and mentally. They have had and will have lasting negative consequences to her physical, emotional and mental wellbeing.

134.    Additionally, and as indicated, since filing the above-described Complaint with the MHRC and the EEOC, Plaintiff has asked ElleVet for information relevant to her role as one of the Company's Directors. She has either received no response, or responses from ElleVet's lawyers indicating that she is not entitled to receive the information that she has requested, that she is limited to receiving only the particular documents that ElleVet's management elects to distribute in advance of meetings of its Board of Directors, that she is not entitled to receive information between Board meetings and that she cannot request information directly from the Company's management.

135.    ElleVet has also instructed Company executives, including its Chief Financial Officer, not to speak with Plaintiff or respond to her reasonable questions.

136. Upon information and belief, Williams receives information, has access to senior management and is involved in strategizing and decision making on various matters before they reach the Board.

137. ElleVet's lawyers have also responded to Plaintiff's efforts to obtain information in her role as a director by stating that as a Board member, her role is limited to managing the strategic direction of the Company and overseeing management.

138. In addition, Plaintiff has requested that certain statements made at Board meetings be included in the meeting minutes. Those requests have been denied.

139. All of the foregoing is illegal and contrary to her legal rights as a Director to receive information and participate in Company matters and is occurring in retaliation for Plaintiff having filed her Complaint with the MHRC and EEOC. Additionally, the Company's preferential treatment of Mr. Williams also violates the law because all directors are entitled to equal access to ElleVet's information.

140. Furthermore, ElleVet's lawyers have explicitly admitted that they are using the Complaint Plaintiff filed with the MHRC and EEOC as a basis for denying her the information to which she is entitled. Specifically, comparing Plaintiff's situation to Williams in one email, they stated, "Mr. Williams is not currently adverse to the Company in any pending litigation. Thus, Mr. Williams' interaction with senior management does not threaten the Company's legitimate interests."

141. In addition to being a "smoking gun" admission of retaliation, the underlying premise of the statement is false – the information Plaintiff is seeking and has sought does not threaten "the Company's legitimate interests." In fact, the information Plaintiff has requested has nothing to do with the claims she asserted in her Complaint.

26

142. Specifically, among other things, Plaintiff has requested:

    a.    The launch plan for ElleVet's new dental chews,

    b.    Information regarding the Company's budget and financials, and

    c.    Information regarding ElleVet's proposed price increases.

To date, the Company has not provided any of this information.

143. Although Plaintiff has made the Company aware that it is violating the law by not providing the information she needs to fulfill her role as Director, ElleVet continues to refuse to provide her with the information that she has requested and is entitled to.

144. Defendants are denying Plaintiff the information that she is entitled to in retaliation for her filing the Complaint with the MHRC and EEOC. Upon information and belief, Defendants are doing so at the direction of Kjaer.

145. All of the foregoing violates Maine and federal law and entitles Plaintiff to damages.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF THE MAINE WHISTLEBLOWERS' PROTECTION ACT AS ENFORCED THROUGH THE MAINE HUMAN RIGHTS ACT
### (26 M.R.S. § 831, *et seq.*; 5 M.R.S. § 4551, *et seq.*)
### (ELLEVET AND KJAER)

146. Plaintiff repeats and re-alleges all prior paragraphs of this Complaint as if set forth more fully herein.

147. Upon information and belief, at all times relevant herein, Defendants were employers subject to the MWPA.

148. Upon information and belief, at all times relevant herein, Plaintiff was an employee or eligible employee of Defendants, who was qualified and eligible for the MWPA's protections.

Specifically, Plaintiff was a person who performed a service for wages or other remuneration under a contract of hire, written or oral, expressed or implied for Defendants (i.e.., her salary she received for the work, the services, she did on behalf of the Defendants as the Chief Creative Officer and the fee(s) she received in exchange for her Board service).

149.    5 M.R.S. § 4572(1)(A) of the MHRA provides a direct cause of action for employees like Plaintiff who allege discrimination based on MWPA-protected whistleblowing activity.

150.    Plaintiff engaged in protected activity under the MWPA, and Defendants retaliated against her in multiple ways including but not limited to, by terminating her employment.

151.    Specifically, and is set forth at length herein, Plaintiff, in good faith reported orally and in writing to Defendants (and had her legal counsel report as well) what she had reasonable cause to believe were violations of a law or rule adopted under the laws of the State of Maine, a political subdivision thereof or the United States.

152.    In addition, as is set forth at length herein, Plaintiff, in good faith reported orally and in writing to Defendants (and had her legal counsel report as well) what she had reasonable cause to believe were conditions or practices that would put at risk the health or safety of herself or other individuals.

153.    Notwithstanding that throughout the time that Plaintiff worked for Defendants, she performed her duties satisfactorily, among other acts of retaliation described above, Defendants limited her role within the business, then terminated her employment and refused and are still refusing to provide her with information to which she is entitled that is relevant to her Board duties in retaliation for and in response to her engaging in protected activity under the MWPA.

154.    Defendants, including their agents and/or employees, committed the foregoing acts and omissions with express or actual malice.

28

155.    Pleading in the alternative, the acts and omissions of Defendants, including their agents and/or employees, although motivated by something other than ill will toward Plaintiff, were so outrageous that malice toward Plaintiff can be implied.

156.    As a result of Defendants' discriminatory and retaliatory actions as set forth herein, Plaintiff has suffered and is entitled to damages, including but not limited to: lost wages and benefits, compensatory and punitive damages, including emotional pain and suffering and lost enjoyment of life, attorney's fees, costs and expenses.

WHEREFORE, Plaintiff respectfully requests that the Court award her damages in the form of lost back pay, front pay, compensatory damages, punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief and all such other and further relief to which she is entitled.

## COUNT II
## VIOLATION OF THE MAINE HUMAN RIGHTS ACT
## DISCRIMINATION, HARASSMENT AND RETALIATION BASED UPON DISABILITY
## (5 M.R.S. § 4551, *et seq.*)
## (ELLEVET)

157.    Plaintiff repeats and re-alleges all prior paragraphs of this Complaint as if set forth more fully herein.

158.    At all times relevant herein, ElleVet was an employer subject to the MHRA.

159.    At all times relevant herein, Plaintiff was an employee or eligible employee of ElleVet, who was qualified and eligible for the MHRA's protections. Specifically, Plaintiff was an individual employed by an employer.

160.    At all times relevant herein, Plaintiff suffered from PTSD as a result of Kjaer's treatment of her, which substantially limited her from being able to perform major life activities

29

including, but not limited to, eating, sleeping and digesting food, due to her anxiety, insomnia, nausea, trembling and other symptoms.

161.    At all times relevant herein, Plaintiff was a qualified individual with a disability within the meaning of the MHRA.

162.    At all times relevant herein, Plaintiff was qualified and able to perform the essential functions of her job, with or without reasonable accommodation.

163.    The MHRA prohibits disability-based harassment, discrimination and retaliation against employees like Plaintiff. It also requires a reasonable accommodation of Plaintiff's disability, her PTSD.

164.    As described herein, Plaintiff engaged in protected conduct under the MHRA by requesting the accommodations of being allowed to work remotely, a changes in the manner in which Kjaer supervised her (including communicating with her in writing as much as possible; not yelling at her or talking to her in a hostile and/or demeaning manner; not cornering her; not threatening her; not lying to her; not doing things to trigger her PTSD; and not being dismissive of her when alone or in front of others) and by reporting Kjaer's above-described harassment, discrimination and retaliation.

165.    As described herein, Plaintiff also engaged in protected conduct under the MHRA by filing her Complaint and Amended Complaint with the MHRC and EEOC.

166.    As a result, she suffered adverse actions (including, but not limited to additional harassment and retaliation, failure to accommodate her disability, her termination in violation of state and federal law and ElleVet denying her materials and information to which she is entitled as a Board member). A causal connection exists between the protected conduct and the adverse actions.

30

167.    Thus, notwithstanding that throughout the time that Plaintiff worked for ElleVet, she performed satisfactorily in her roles, ElleVet took the above-described adverse actions in retaliation for and in response to her engaging in protected activity under the MHRA (including, but not limited to requesting reasonable accommodations, reporting Kjaer's above-described harassment, discrimination and retaliation and filing her Complaint and Amended Complaint with the MHRC and EEOC).

168.    Additionally, ElleVet regarded, perceived and/or treated Plaintiff as disabled under the MHRA and discriminated against and harassed her, including terminating her employment because of her disability and interfering with her rights under the MHRA in retaliation for her exercising same and for complaining about Kjaer's retaliation.

169.    As set forth herein, ElleVet has also intentionally discriminated against Plaintiff because of her disability and illegally denied her reasonable accommodations therefor.

170.    ElleVet, including its agents and/or employees, committed the foregoing acts and omissions with express or actual malice.

171.    Pleading in the alternative, the acts and omissions of ElleVet, including its agents and/or employees, although motivated by something other than ill will toward Plaintiff, were so outrageous that malice toward her can be implied.

172.    As a result of the discriminatory, harassing and retaliatory actions of ElleVet as set forth herein, Plaintiff has suffered and is entitled to damages, including but not limited to: lost wages and benefits, compensatory and punitive damages, including emotional pain and suffering and lost enjoyment of life, attorney's fees, costs and expenses.

WHEREFORE, Plaintiff respectfully requests that the Court award her damages in the form of lost back pay, front pay, compensatory damages, punitive damages, attorney's fees, costs

31

and expenses, equitable and injunctive relief and all such other and further relief to which she is entitled under the MHRA or otherwise.

**COUNT III**
**VIOLATION OF THE MAINE HUMAN RIGHTS ACT**
**DISCRIMINATION, HARASSMENT AND RETALIATION BASED UPON GENDER**
**(5 M.R.S. § 4551, *et seq.*)**
**(ELLEVET)**

173.    Plaintiff repeats and re-alleges all prior paragraphs of this Complaint as if set forth more fully herein.

174.    At all times relevant herein, ElleVet was an employer subject to the MHRA.

175.    At all times relevant herein, Plaintiff was an employee or eligible employee of ElleVet, who was qualified and eligible for the MHRA's protections. Specifically, Plaintiff was an individual employed by an employer.

176.    The MHRA prohibits gender-based harassment, discrimination and retaliation against employees like Plaintiff.

177.    Plaintiff engaged in protected conduct under the MHRA by reporting the above-described gender-based harassment, retaliation and discrimination by Kjaer.

178.    As described herein, Plaintiff engaged in protected conduct under the MHRA by filing her Complaint and Amended Complaint with the MHRC and EEOC.

179.    As a result, she suffered adverse actions (additional harassment, retaliation and discrimination, her termination in violation of state and federal law and ElleVet denying her materials and information to which she is entitled as a Board member), and a causal connection existed between the protected conduct and the adverse actions.

180.    Thus, notwithstanding that throughout the time that Plaintiff worked for ElleVet, she performed satisfactorily in her roles, ElleVet took the above-described adverse actions in

retaliation for and in response to her engaging in protected activity under the MHRA (including, but not limited to reporting the above-described harassment, retaliation and discrimination by Kjaer and filing her Complaint and Amended Complaint with the MHRC and EEOC).

181.    As set forth herein, ElleVet has intentionally discriminated against Plaintiff because of her gender.

182.    ElleVet, including its agents and/or employees, committed the foregoing acts and omissions with express or actual malice.

183.    Pleading in the alternative, the acts and omissions of ElleVet, including its agents and/or employees, although motivated by something other than ill will toward Plaintiff, were so outrageous that malice toward her can be implied.

184.    As a result of the discriminatory, retaliatory and harassing actions of ElleVet as set forth herein, Plaintiff has suffered and is entitled to damages, including but not limited to: lost wages and benefits, compensatory and punitive damages, including emotional pain and suffering and lost enjoyment of life, attorney's fees, costs and expenses.

WHEREFORE, Plaintiff respectfully requests that the Court award her damages in the form of lost back pay, front pay, compensatory damages, punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief and all such other and further relief to which she is entitled under the MHRA or otherwise.

## COUNT IV
## VIOLATION OF THE MAINE HUMAN RIGHTS ACT
## PROHIBITIONS AGAINST RETALIATION AND COERCION
## (5 M.R.S. § 4633)
## (ELLEVET)

185.    Plaintiff repeats and re-alleges all prior paragraphs of this Complaint as if set forth more fully herein.

33

186. At all times relevant herein, ElleVet was a person within the meaning of the MHRA.

187. At all times relevant herein, Plaintiff was an individual who opposed act(s) or practice(s) that are unlawful under the MHRA.

188. As set forth herein, Plaintiff was also an individual who made a charge (the Complaint and Amended Complaint she filed with the MHRC), assisted or participated in any manner in an investigation, proceeding or hearing under the MHRA.

189. As is set forth herein, as a result of Plaintiff opposing act(s) or practice(s) that are unlawful under the MHRA and making a charge, assisting and participating in any manner in an investigation, proceeding or hearing under the MHRA, Defendants have retaliated against her in violation of 5 M.R.S. § 4633(1).

190. As is set forth herein, Plaintiff also exercised and attempted to enjoy rights granted or protected by the MHRA – specifically, the rights to be free from discrimination, harassment and retaliation based upon her gender, disability status and/or whistleblower status.

191. As is set forth herein, ElleVet coerced, intimidated, threatened and interfered with Plaintiff exercising and attempting to enjoy rights granted to her or protected by the MHRA in violation of 5 M.R.S. § 4633(2).

192. ElleVet, including its agents and/or employees, committed the foregoing acts and omissions with express or actual malice.

193. Pleading in the alternative, the acts and omissions of ElleVet, including its agents and/or employees, although motivated by something other than ill will toward Plaintiff, were so outrageous that malice toward her can be implied.

194.    As a result of the retaliatory and coercive actions of ElleVet as set forth herein, Plaintiff has suffered and is entitled to damages, including but not limited to all damages, remedies and procedures to which she is entitled under 5 M.R.S. § 4633(1).

WHEREFORE, Plaintiff respectfully requests that the Court award her damages in the form of lost back pay, front pay, compensatory damages, punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief and all such other and further relief to which she is entitled under the MHRA or otherwise.

## COUNT V
## VIOLATION OF TITLE VII OF
## THE CIVIL RIGHTS ACT OF 1964, AS AMENDED
## 42 U.S.C. § 2000e, *et. seq.*
## (ELLEVET)

195.    Plaintiff repeats and re-alleges all prior paragraphs of this Complaint as if set forth more fully herein.

196.    At all times relevant herein, ElleVet was an employer subject to Title VII.

197.    At all times relevant herein, Plaintiff was an employee or eligible employee of ElleVet, who was qualified and eligible for Title VII's protections. Specifically, as set forth herein, Plaintiff was an individual employed by an employer.

198.    Title VII prohibits gender-based harassment, discrimination and retaliation against employees like Plaintiff.

199.    Plaintiff engaged in protected conduct under Title VII, including, but not limited to reporting the above-described sexual harassment, gender discrimination and retaliation by Kjaer and filing her Complaint and Amended Complaint with the MHRC and EEOC, she suffered adverse actions (additional harassment and retaliation, her termination in violation of state and

35

federal law and ElleVet denying her materials and information to which she is entitled as a Board member) and a causal connection existed between the protected conduct and the adverse actions.

200. Thus, notwithstanding that throughout the time that Plaintiff worked for ElleVet, she performed satisfactorily in her roles, ElleVet took the above-described adverse actions in retaliation for and in response to her engaging in protected activity under Title VII (including, but not limited to reporting the above-described sexual harassment, gender discrimination and retaliation by Kjaer and filing her Complaint and Amended Complaint with the MHRC and EEOC).

201. ElleVet, including its agents and/or employees, committed the foregoing acts and omissions with express or actual malice.

202. Pleading in the alternative, the acts and omissions of ElleVet, including its agents and/or employees, although motivated by something other than ill will toward Plaintiff, were so outrageous that malice toward Plaintiff can be implied.

203. As a result of the discriminatory, harassing and retaliatory actions as set forth herein, Plaintiff has suffered and is entitled to damages, including but not limited to, lost wages and benefits, compensatory and punitive damages, including emotional pain and suffering and lost enjoyment of life, attorney's fees, costs and expenses.

WHEREFORE, Plaintiff respectfully requests that the Court award her damages in the form of lost back pay, front pay, compensatory damages, punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief and all such other and further relief to which she is entitled under Title VII or otherwise.

## COUNT VI
## VIOLATION OF THE AMERICANS WITH DISABILTIES ACT
### 42 U.S.C. § 12101, *et seq.*
### (ELLEVET)

204.    Plaintiff repeats and re-alleges all prior paragraphs of this Complaint as if set forth more fully herein.

205.    At all times relevant herein, ElleVet was an employer subject to the requirements of the ADA.

206.    At all times relevant herein, Plaintiff was an employee or eligible employee qualified and eligible for the protections of the ADA.

207.    At all times relevant herein, Plaintiff suffered from PTSD as a result of Kjaer's treatment of her, which substantially limited her from being able to perform several life activities, including eating, sleeping and digestion.

208.    At all times relevant herein, Plaintiff was a qualified individual with a disability within the meaning of the ADA.

209.    At all times relevant herein, Plaintiff was qualified and able to perform the essential functions of her job, with or without reasonable accommodation.

210.    ElleVet regarded, perceived and/or treated Plaintiff as disabled under the ADA and discriminated and terminated her employment because of her disability and/or in retaliation for Plaintiff availing herself of her rights under the ADA (including, but not limited to requesting the above-described reasonable accommodations, complaining about Kjaer's harassment and retaliation and filing her Complaint and Amended Complaint with the MHRC and EEOC) and in interference with those rights.

37

211. ElleVet intentionally discriminated against Plaintiff because of her disability and illegally denied the above-described reasonable accommodations she sought therefor.

212. ElleVet committed the foregoing acts and omissions with express or actual malice.

213. Pleading in the alternative, the acts and omissions of ElleVet, although motivated by something other than ill will toward Plaintiff, were so outrageous that malice toward her can be implied.

214. As a result of Defendant's discriminatory actions as set forth herein, Plaintiff has suffered and is entitled to damages, including but not limited to lost wages and benefits, compensatory and punitive damages, including emotional pain and suffering and lost enjoyment of life, attorney's fees, costs and expenses.

WHEREFORE, Plaintiff respectfully requests that the Court award her damages in the form of lost back pay, front pay, compensatory damages, punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief and all such other and further relief to which she is entitled.

**COUNT VII**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(KJAER)**

215. Plaintiff re-alleges the preceding paragraphs in her Complaint as though set forth at length.

216. Kjaer's repeated cruelty and misogyny towards Plaintiff as set forth herein was so blatant and frequent that his actions can only be characterized as intentional or reckless.

217. Pleading in the alternative, Kjaer's actions were such that he was or should have been substantially certain that his conduct would result in Plaintiff suffering emotional distress. In fact, it is clear that causing her severe emotional distress was his goal.

38

218.    Kjaer's conduct was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious and utterly intolerable in a civilized community.

219.    Kjaer's conduct did cause Plaintiff emotional distress – which manifested itself by her developing PTSD and the symptoms and conditions described herein.

220.    The emotional distress that Plaintiff suffered was so severe that no reasonable person could be expected to endure it.

221.    Kjaer, including his agents and/or employees, committed the foregoing acts and omissions with express or actual malice.

222.    Pleading in the alternative, Kjaer's acts and omissions, including those of his agents and/or employees, although motivated by something other than ill will toward Plaintiff, were so outrageous that malice toward Plaintiff can be implied.

223.    As a result of actions and omissions as set forth herein, Plaintiff has suffered and is entitled to damages, including but not limited to, lost wages and benefits, compensatory and punitive damages, including emotional pain and suffering and lost enjoyment of life, attorney's fees, costs and expenses.

WHEREFORE, Plaintiff respectfully requests that the Court award her damages in the form of lost back pay, front pay, compensatory damages, punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief and all such other and further relief to which she is entitled under Maine law.

## COUNT VIII
## UNJUST ENRICHMENT
## (ELLEVET)

224.    Plaintiff re-alleges the preceding paragraphs in her Complaint as though set forth at length.

225.    As set forth herein, upon information and belief, ElleVet did not pay Plaintiff all that she was entitled to receive during and following the termination of her employment.

226.    Additionally, Plaintiff and Kjaer were to be paid the same amount for their work for ElleVet. Upon information and belief, the Company paid Plaintiff less than Kjaer.

227.    As set forth herein, Plaintiff conferred benefits upon ElleVet by *inter alia*, providing the labor and services set forth herein.

228.    ElleVet benefited from receiving same.

229.    ElleVet had knowledge of and an appreciation for the benefits conferred by Plaintiff.

230.    As described herein, ElleVet accepted and retained the benefits under circumstances that make it inequitable for the Company to retain their value and on the grounds of fairness and justice, the law compels performance of a legal and moral duty for ElleVet to repay said benefits.

231.    ElleVet committed the foregoing acts and omissions with express or actual malice.

232.    Pleading in the alternative, ElleVet's acts and omissions, although motivated by something other than ill will toward Plaintiff, were so outrageous that malice toward Plaintiff can be implied.

233.    The foregoing entitles Plaintiff to an award of punitive damages, in addition to the other damages to which she is entitled.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment in her favor on Count VIII of her Complaint and that the Court award her all damages to which she is entitled as well as all such other and further relief to which she is entitled.

40

## COUNT IX
## VIOLATION OF MAINE WAGE AND HOUR LAWS
## 26 M.R.S. §§ 626; 626-A
## (ELLEVET)

234. Plaintiff re-alleges the preceding paragraphs in her Complaint as though set forth at length.

235. As set forth herein, at all times relevant, Plaintiff was an employee of ElleVet and an individual entitled to the protections of Maine's wage and hour laws.

236. As set forth herein, at all times relevant, ElleVet was subject to Maine's wage and hour laws.

237. As set forth herein, upon information and belief, ElleVet did not pay Plaintiff all that she was entitled to receive during and following the termination of her employment.

238. Additionally, Plaintiff and Kjaer were to be paid the same amount for their work for ElleVet. Upon information and belief, the Company paid Plaintiff less than Kjaer.

239. Despite Plaintiff demanding her unpaid and owed wages, ElleVet has failed to pay Plaintiff the above-described wages and continues to fail to pay them.

240. The foregoing has caused and continues to cause Plaintiff damages.

WHEREFORE, Plaintiff respectfully requests that the Court award her all damages, including all trebled damages and attorneys' fees and all such other and further relief to which she is entitled.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury on all counts to which that right applies.

Respectfully submitted this November 27, 2024.

Martha C. Gaythwaite, ME Bar No. 2811
Rachel M. Wertheimer, ME Bar No. 5006
Erik Peters, ME Bar No. 9188
Attorneys for Plaintiff Amanda Howland

VERRILL DANA, LLP
One Portland Square
Portland, ME 04101
(207) 774-4000
Mgaythwaite@verrill-law.com
Rwertheimer@verrill-law.com
Epeters@verrill-law.com

27088747_2

42