UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

AMANDA HOWLAND,                    )
                                  )
            Plaintiff             )
                                  )
      v.                          )        2:24-cv-00442-JCN
                                  )
ELLEVET SCIENCES INC., et al.,    )
                                  )
            Defendant             )

**ORDER ON MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff Amanda Howland (Plaintiff or Howland) filed a multi-count complaint against her former romantic and business partner, Defendant Christian Kjaer (Kjaer), and against Defendant ElleVet Sciences, Inc. (ElleVet), seeking damages under state and federal law.  Defendants have each requested summary judgment on all counts of Plaintiff's complaint.  (Motions for Summary Judgment, ECF Nos. 28 and 29.)

Following review of the record and after consideration of the parties' arguments, the Court grants Defendants' motions in part.

**FACTUAL BACKGROUND**[1]

A.    **The Beginning of the Personal Relationship and the Founding of ElleVet**

Plaintiff and Kjaer met in 2016 and started dating in May of that year.  (SMF ¶ 1, ECF No. 30; Kjaer Dep. I at 22, ECF No. 26-36.)  Plaintiff told Kjaer about her idea of creating and selling hemp products designed to help animals.  (*See* ASMF ¶¶ 1-2, ECF No.

---

[1] The factual background is derived from the summary judgment record, which is viewed in the light most favorable to Plaintiff, as the nonmoving party. *Barton v. Clancy*, 632 F.3d 9, 12 (1st Cir. 2011).

36-1; Pl. Dec. ¶ 1, ECF No. 36-3.)[2]  Thereafter, Plaintiff and Kjaer established the company that became ElleVet.  (SMF ¶ 2.)  Today, ElleVet is a successful business located in South Portland that employs approximately fifty people and has annual sales of approximately twenty million dollars.  (ASMF ¶ 104.)

At first, ElleVet operated out of Plaintiff's home in South Portland; Plaintiff did everything from there, including public relations, marketing, sales, and locating vendors. (ASMF ¶ 8.)  Kjaer was working full-time for a different company; he spent his spare time developing the commercial side of ElleVet.  (ASMF ¶ 9; Def. Reply to ASMF ¶ 9, ECF No. 41.)  At some point, Kjaer moved into Plaintiff's house in South Portland.  (ASMF ¶ 10.)

When it became clear that the clinical trial was a success, Kjaer demanded that he be named the CEO of the company and rejected Plaintiff's proposal that there be two CEOs; Plaintiff agreed to Kjaer's demand after he promised he would not use his position to harm her.  (ASMF ¶ 11.)[3]  Plaintiff and Kjaer brought Michael Williams (Williams) into ElleVet in consideration for Williams loaning startup funds to the company.  (SMF ¶ 3; ASMF ¶ 12.)  The initial members of ElleVet Sciences, LLC— Kjaer, Plaintiff, and an entity owned, at least in part, by Williams—entered into a Limited Liability Company

---

[2] Although Kjaer denies that Plaintiff came up with the idea of starting ElleVet, (Def. Reply to ASMF ¶¶ 1-2, ECF No. 41), his deposition transcript supports the notion that Plaintiff generated the idea for the product that ElleVet was established to sell.  (Kjaer Dep. I at 24 & 92.)

[3] Defendants qualify this statement, citing Plaintiff's testimony that she and Kjaer discussed that he would be CEO in name only and that they would be equals and would each have decision-making authority in their respective areas.  (Def. Reply to ASMF ¶ 11; Pl. Dep. at 113-14, ECF No. 26-3.)

Agreement in November 2017.  (SMF ¶¶ 4-5.)  Williams, Kjaer, and Plaintiff have, at all relevant times, served as managers of ElleVet's three-member Board.  (SMF ¶ 8.)

**B.    The First Break-Up and Plaintiff's First Termination**

At some point, Kjaer and Williams set up a company to serve as a middleperson between ElleVet and the farmer who supplied products to ElleVet, with Kjaer and Williams splitting the profit on the markup.  (ASMF ¶ 14.)  Kjaer and Williams also started related companies in Europe and Singapore.  (ASMF ¶ 15.)  They undertook these actions for their own benefit without Plaintiff's knowledge.  (*See* ASMF ¶ 17; Pl. Dep. at 142.)

In 2019, Plaintiff and Kjaer ended their personal relationship.  (Complaint ¶ 13, ECF No. 2-1.)  Around that same time, Kjaer and Williams voted to terminate Plaintiff's employment with ElleVet purportedly because she was not managing employees appropriately.  (SMF ¶ 13.)  Plaintiff alleged that the decision to terminate her employment was retaliatory.  (SMF ¶ 14.)

In November 2019, Plaintiff filed a complaint with the Maine Human Rights Commission alleging discrimination on the basis of sex.  (SMF ¶ 15.)  She also sued Kjaer, Williams, and ElleVet, alleging multiple claims, including a claim for intentional infliction of emotional distress.  (ASMF ¶ 16.)  Plaintiff alleged that she was suffering "severe emotional distress" consisting of stress, trouble concentrating, frequent nausea, crying episodes, physical shaking, anxiety, and depression.  (SMF ¶ 106.)

**C.    The Resumption of the Relationship and Plaintiff's Role at ElleVet**

When the litigation started to intensify and, in Plaintiff's view, when it became clear that Kjaer was going to lose the case, Kjaer apologized to Plaintiff and asked for her

3

forgiveness.  (ASMF ¶ 18.)  He claimed that he had been led astray by Williams.  (*Id.*)  He begged Plaintiff to take him back.  (*Id.*)  He repeatedly told Plaintiff that he loved her, that he had learned from his mistakes, and that nothing like this would ever happen again.  (Complaint ¶ 24.)  Kjaer also told her that he wanted her to return to work at ElleVet, and that they would be true partners.  (Complaint ¶ 25.)  Plaintiff forgave Kjaer and agreed to resume a relationship with him.  (ASMF ¶ 19.)  She also agreed to settle her lawsuit in exchange for various considerations, including her reinstatement as ElleVet's Chief Creative Officer.  (Complaint ¶ 27.)

In November 2021, Plaintiff entered into settlement agreements with ElleVet, Kjaer, and Williams in which she released all claims she had against them as of that date.  (SMF ¶ 17.)  In one of the settlement agreements, the parties stipulated to the validity of Member Services Agreements among ElleVet and Kjaer and Howland, respectively.  (SMF ¶ 18.)  Plaintiff's Member Services Agreement ("MSA") specified that ElleVet retained her as its Chief Creative Officer and included the following provision regarding termination without cause:

> a. Notice other than for Cause.  ElleVet, acting through its Board of Managers, may terminate this Agreement at any time for any reason other than for Cause . . . by providing not less than six (6) months' advance written notice of termination to Howland.  Alternatively, ElleVet may terminate this Agreement immediately by providing written notice accompanied by six (6) months of payments at Howland's then regular monthly base compensation.  In the event that ElleVet terminates this Agreement under this Section . . . , Howland shall be entitled to (i) her regularly scheduled compensation through the date of termination, (ii) any other payments due under this Section . . . and (iii) nine (9) months of her then regular monthly base compensation as severance pay, payable at regularly scheduled payment periods . . . .  ElleVet shall have no further

4

> obligation to pay or provide Howland with any additional compensation or benefits.

(SMF ¶ 19.)

> With respect to compensation, Plaintiff's MSA provided:

> Compensation for services under this Agreement shall constitute guaranteed payments, and not wages. Such payments shall be reported on Form K-1 as guaranteed payments. ElleVet will not make any deductions or withholdings for income taxes, FICA, FUTA, state unemployment taxes, worker's compensation, or any other employment-related taxes or withholdings. Howland is performing services under this Agreement as a Member, and not an employee, of ElleVet.

(SMF ¶ 21.) Plaintiff was paid monthly for her work as Chief Creative Officer at the rate set forth in her MSA. (ASMF ¶ 106.) She was paid separately for services performed as an ElleVet manager and for distributions she received as a member of ElleVet. (*Id.*)

The Amended and Restated Limited Liability Company Agreement in effect as of November 11, 2021, provided for distribution of profits to the members. (SMF ¶ 7.) The Amended and Restated LLC Agreement also stated:

> The management of the affairs, property and business of the Company shall be vested in a Board of Managers (the "Board") consisting of three (3) managers (each a "Manager"). The Board shall manage the affairs of the Company and make all decisions with regard thereto, except (i) where the approval of a Member is expressly required by a non-waivable provision of applicable law or (ii) as expressly provided in another provision of this Agreement. The vote of a majority of the Managers shall be the act of the Board. Each manager shall have one vote.

(SMF ¶ 6; Williams Dec. Ex. 2, p. 7, ECF No. 30-3.) There were times when Williams and Plaintiff outvoted Kjaer, including an occasion when Plaintiff suggested that the Board reevaluate the company's approval matrix because she felt it delegated too much authority to Kjaer; Williams agreed, and the matrix was amended. (SMF ¶ 11.) There were also

5

occasions when Kjaer and Plaintiff outvoted Williams, including when they agreed to remove him from his position as chairman of the Board. (SMF ¶ 9.) And there were times when Williams and Kjaer outvoted Plaintiff. (*See, e.g.*, ASMF ¶ 73.)

In the day-to-day operation of ElleVet, as reflected in the entity's organizational chart, Kjaer was CEO and supervised Plaintiff in her role as Chief Creative Officer. As CEO, Kjaer could ask Plaintiff to do certain things and not to do other things. (ASMF ¶ 23.)[4] Kjaer believed that he had the authority to "guide" ElleVet employees, including Plaintiff, in their operational roles. (ASMF ¶ 24.)

Kjaer worked in the office every day, often going to work early. (SMF ¶ 25.) Plaintiff worked in the office some days, and some days she worked from home. (SMF ¶ 23.) Plaintiff had a private office at ElleVet; Kjaer did not. (SMF ¶ 26.) Some days, Plaintiff interacted frequently with Kjaer at the office; other days, she did not interact with him at all. (SMF ¶ 27.)

When Plaintiff and Kjaer resumed their personal relationship, they started living together again, first in Plaintiff's house and then in a house they bought together. (SMF ¶ 22.) Initially, Plaintiff was excited about resetting her relationship with Kjaer and their work together was better. (SMF ¶ 28.)

From Plaintiff's perspective, her interactions with Kjaer gradually deteriorated. (SMF ¶ 29.) Plaintiff began to worry that Kjaer was breaking his promise to her and

---

[4] Although Defendants deny this statement, it is supported by Kjaer's deposition testimony, (Kjaer Dep. I at 36), and Defendants have not offered any evidence that contradicts this statement. (*See* Def. Reply to ASMF ¶ 23.)

returning to his prior wrongful behavior.  (ASMF ¶ 22.)  As a result of Kjaer's comments in 2022, Plaintiff began to believe that she would be "there if he could use me but he would have no problem finding a way to get me out if he felt that I was not agreeable[,] or he was mad at me or he had no use."  (SMF ¶ 99.)

Plaintiff believes that Kjaer tends to talk over people who disagree with him, and that he disregards people with different opinions.  (SMF ¶¶ 30, 31.)  According to Plaintiff, Kjaer treats people in this way regardless of their gender.  (SMF ¶ 32.)[5]

Other employees complained to ElleVet's Human Resources Director (H.R.) about Kjaer's behavior.  (ASMF ¶ 107.)  Employees complained about Plaintiff's management style as well.  (SMF ¶ 57.)  Employees also expressed concerns about the way Kjaer and Plaintiff interacted with each other: one employee claimed that "they gave conflicting direction on things, they were never on the same page, [and] they put their own personal trials and tribulations before the needs of the company."  (SMF ¶ 42.)  One employee reported that it was difficult for employees to work together effectively when the co-owners of the business were telling employees not to do what the other said.  (SMF ¶ 43.)  Another employee reported "feeling very in the middle" between Kjaer and Plaintiff.  (SMF ¶ 44.)

In August 2022, Plaintiff exchanged messages with H.R. regarding an employee Plaintiff supervised whose performance was not acceptable.  (SMF ¶ 33.)  She told H.R. that if Kjaer engaged with the employee over her head, it would be "extremely

---

[5] Plaintiff denies that the treatment she received from Kjaer was the same as his treatment of other employees.  (Pl. Response to SMF ¶¶ 30-32.)

undermining" to her.  (SMF ¶ 34.)  This is Plaintiff's only written complaint to H.R. regarding Kjaer's behavior that Plaintiff has located.  (SMF ¶ 35.)

In a December 2022 email to Plaintiff, Kjaer stated that he believed that their work together was not productive.  (SMF ¶ 38.)  He also suggested that they talk about the timing of her exit from the business and different options she might have.  (SMF ¶ 39.)  Plaintiff agrees that the way she and Kjaer worked together was not productive.  (SMF ¶ 40.)

In late 2022 and early 2023, Kjaer worked with a human resources consultant to provide a new job description for Plaintiff.  (ASMF ¶ 34; Def. Reply to ASMF ¶ 34.) Plaintiff believes that Kjaer did so to try to "get rid of" her or limit her authority.  (*Id.*; SMF ¶ 41.)  Kjaer asserts that he engaged the consultant to help him better collaborate with Plaintiff at work.  (*See* SMF ¶ 48.)[6]

**D.     The Second Break-Up and the May Agreement**

In April 2023, Plaintiff felt Kjaer's behavior was getting worse: he was being secretive and extremely demeaning.  (SMF ¶ 45.)  At some point that spring, the personal relationship between Kjaer and Plaintiff ended.

Around that same time, Kjaer recognized that it was hard for him to collaborate with Plaintiff at work.  (SMF ¶ 47.)  He felt that he had two options: he could either ask the Board to terminate Plaintiff's MSA or try to correct the situation.  (SMF ¶ 49.)  Kajer

---

[6] Plaintiff denies this statement, asserting that she was unable to depose the consultant and that Defendants "should not be allowed to offer hearsay statements from an uncooperative witness" in support of their motions.  (Pl. Response to SMF ¶ 48.)  However, the statement is not supported by a hearsay statement from the consultant; it is supported by Kjaer's deposition testimony regarding his motivations.  (*See* SMF ¶ 48; Kjaer Dep. I at 147.)

believed their lawyers might be able to help.  (SMF ¶ 50.)  He called his lawyer, who called Plaintiff's lawyer for assistance.  (SMF ¶ 51.)

For her part, Plaintiff felt that history was repeating itself.  (*See* ASMF ¶ 36.)  She believed that by involving counsel, Kjaer was setting the stage to terminate her employment again.  (*Id.*; SMF ¶ 52.)  By May 11, 2023, Plaintiff "knew" she was being pushed out of ElleVet.  (SMF ¶ 53.)

Although Plaintiff objected to involving lawyers, Plaintiff and her lawyer met with Kjaer and his lawyer to discuss how the parties might be able to work together going forward.  (*See* ASMF ¶ 38; SMF ¶ 54.)  Kjaer and his attorney stated their goal was to work collaboratively to develop a plan so the company could succeed.  (SMF ¶ 56.)  During the meetings with counsel, Kjaer stated multiple times that Plaintiff was the genius behind the success of the company.  (ASMF ¶ 39.)  He also stated that no one could replace Plaintiff and her creative skills.  (ASMF ¶ 40.)  During the meetings, Kjaer and his attorney identified the following issues: (1) Plaintiff was not a good manager and needed to step back from that position; (2) Plaintiff needed to accept that Kjaer was CEO; (3) Kjaer and Plaintiff's communication difficulties were causing problems for the company; and (4) Plaintiff was important to the company.  (SMF ¶ 55.)

As a principal reason for requiring Plaintiff's immediate removal as a manager, Kjaer advised that Plaintiff's direct report, Employee K, had come to him in tears saying that she could not work with Plaintiff and that she would quit if something was not done promptly.  (Complaint ¶ 35.)  This was a surprise to Plaintiff, who thought she had a good relationship with Employee K.  (SMF ¶ 58.)  Plaintiff's counsel interviewed several

employees and learned that they had concerns about Plaintiff as a manager.  (SMF ¶ 59.)

Defendants told Plaintiff's counsel that counsel could not speak to Employee K.  (ASMF

¶ 108.)[7]  During the meetings with Kjaer and his lawyer, Plaintiff's lawyer admitted that

Plaintiff had deficiencies as a manager.  (SMF ¶ 60.)  He believed that Kjaer reasonably

opposed Plaintiff's work as a manager.  (SMF ¶ 61.)

In connection with the meetings between Plaintiff and Kjaer and their respective

lawyers, the parties exchanged drafts of a document that came to be known as the May

Agreement.  (ASMF ¶ 42.)  On May 19, 2023, the parties signed the May Agreement,

which provided, among other things, that Plaintiff would be relieved of the responsibility

of managing people, and that she would focus on the creative aspect of the company,

developing ideas, with implementation and execution to be delegated to staff and managers

by Kjaer, or Plaintiff "as directed by" Kjaer.  (Ruprecht Dep. Ex. 1, ECF 26-70.)   In the

May Agreement, Plaintiff acknowledged that Kjaer was CEO and that, in her role as Chief

Creative Officer, she reported to him.  (*Id.*)  She also recognized that, as CEO, Kjaer had

final decision-making authority, subject to the authority of the Board.  (*Id.*)  The May

Agreement contemplated that the company would consider how to replace Kjaer as CEO,

---

[7] There appears to be some dispute about whether Kjaer also told Plaintiff that she could not speak to Employee K or otherwise restricted her ability to communicate with employees.  Plaintiff asserts that Kjaer could tell Plaintiff with whom she could speak at work.  (ASMF ¶ 25.)  Defendants deny this statement, pointing to Kjaer's general testimony that he could not tell Plaintiff what to do at work.  (Def. Reply to ASMF ¶ 25; Kjaer Dep. I at 36.)  However, when he was asked directly whether he told Plaintiff with whom she could and could not speak at work, Kjaer replied: "Well, it's—it's—yeah, I—I think there would be times where I would have—where I might have said that.  I don't recall."  (Kjaer Dep. I at 36.)  For her part, Plaintiff testified that Kjaer told her that she could not speak to Employee K.  (*See* Pl. Dep. at 220 & 236 & 240.)

and that Plaintiff and Kjaer would work with an executive coach.  (SMF ¶ 63.)  Under the May Agreement, Employee K assumed some of the duties previously performed by Plaintiff.  (SMF ¶ 69.)

The May Agreement provided a process for Plaintiff to raise issues with Kjaer and for them to try to resolve the issues; the May Agreement also provided that if Plaintiff was not satisfied with the resolution, she could bring the issues to the Board.  (SMF ¶ 65.)

In the May Agreement, Kjaer and Plaintiff agreed that they would:

> commit to engage in healthy communication practices such as avoiding personal attacks, engaging in active listening, allowing each to say what they want to say without being interrupted or talked over, sharing "how I feel" as opposed to telling the other person "what you did wrong," not bringing up past complaints, and providing clear answers to questions (as opposed to being dismissive of the other's concerns) including in writing when requested.  Both commit to not give the other person the "silent treatment" following any disagreement and will make a point to be professional in all interactions with each other, especially in the presence of customers, employees and others.

(SMF ¶ 64.)  The parties also acknowledged that they "are human and that mistakes may be made from time to time in regard to healthy communication, but both will do their best to acknowledge those mistakes and attempt to do better."  (SMF ¶ 66.)

According to Plaintiff, Kjaer told her that if she did not sign the May Agreement, he would fire her.  (ASMF ¶ 43.)  Plaintiff believed that if she did not agree to the terms of the May Agreement, she would be fired.  (SMF ¶ 67.)  She chose to sign the May Agreement because she did not want to be fired.  (SMF ¶ 68.)

### E.    Plaintiff's Allegations, Diagnoses, and Complaints

Kjaer has never been physically violent with Plaintiff.  (SMF ¶ 109.)  Plaintiff, however, contends that Kjaer subjected her to intimate partner violence, in the form of gaslighting and emotional abuse.  (*See* ASMF ¶¶ 98-99.)[8]  Plaintiff alleges that Kjaer's misogynistic conduct included: demeaning her decision to stay home and raise her children; using vulgar, sexist language; downplaying claims of sexual harassment by his brother; refusing to terminate an employee who made misogynistic comments on multiple occasions; and telling her to "stop targeting" employees who made sexist remarks.  (*See* SMF ¶ 110; Pl. Response to SMF ¶ 110; Pl. Interrogatory Answer No. 17, ECF No. 26-1.)  She asserts that his cruelty toward her included: dismissing her ideas as "dumb" or examples of "Amanda logic"; interrupting and talking over her at work, even when others were around; excluding her at work from meetings, interviews, and conferences; subjecting her to the "silent treatment" for weeks at a time, sometimes in front of staff; demeaning and berating her in work settings, in a way that made at least one other employee

---

[8] Plaintiff submits that one of her designated expert witnesses, Charles Heller, PhD, opined that Plaintiff is suffering from PTSD "caused by the emotional distress and gaslighting Kjaer subjected her to from 2020 to 2024." (ASMF ¶ 99.)  Defendants argue this statement should be stricken because it is not in Dr. Heller's designation, and because the paragraph of his affidavit referenced does not support the statement. Defendants' request to strike is denied.  Although paragraph 3 of Dr. Heller's affidavit does not directly support this statement, paragraph 6 does. (Heller Aff., ECF No. 36-5.)  His expert designation also states that he performed a domestic violence assessment of Plaintiff and identified "multiple forms of abuse, including emotional abuse . . . and gaslighting[.]"  (Pl. Expert Desig., ECF No. 26-2.)

Defendants also ask the Court to strike ASMF ¶ 92, which concerns the opinion of Amanda Levine, another expert witness designated by Plaintiff.  Defendants challenge the scope of Ms. Levine's expertise.  The Court denies Defendants' request. Based on Plaintiff's expert witness designation, Ms. Levine appears to have sufficient education, training, and experience to permit her to form the opinion that she has been designated to testify about – namely, that Plaintiff was subjected to implicit gender bias by Kjaer and ElleVet. The Court's consideration of the evidence at this stage of the proceeding does not preclude Defendants from challenging Ms. Levine's qualifications and opinions in advance of or at trial.

12

uncomfortable; telling employees not to speak to her; and telling her to do whatever "the [expletive]" he told her to do after she signed the May Agreement. (SMF ¶ 110; Pl. Response to SMF ¶ 110; Pl. Interrogatory Answer No. 17.)

From the spring through the fall of 2023, Plaintiff cried frequently and was often highly agitated and emotional. (ASMF ¶ 52.) During that year, she suffered from emotional distress with some of the same symptoms she experienced in 2019, and other symptoms, including panic attacks, broken blood vessels in her eyes, bleeding gums in the wake of stressful situations, and experiencing a frozen state. (*See* SMF ¶¶ 106-08; Pl. Dep. at 121-24.) One of Plaintiff's close friends became concerned about her physical and emotional well-being and described her as a "completely different person." (ASMF ¶¶ 53-54.) Plaintiff's lawyer described her as "destroyed." (*See* ASMF ¶ 47; Currier Dep. at 95.) He became concerned that Plaintiff might be suicidal. (ASMF ¶ 48.)[9]

Plaintiff sought psychotherapy in the spring of 2023 to deal with symptoms of post-traumatic stress disorder (PTSD). (ASMF ¶ 94.) According to her psychotherapist's records, Plaintiff reported that Kjaer had betrayed her at work by trying to oust her from the business and betrayed her in their personal relationship. (*Id*.) Plaintiff's psychotherapist believes she met the diagnostic criteria for PTSD. (SMF ¶ 115; ASMF ¶ 95.) Plaintiff's psychiatrist also determined that Plaintiff meets the diagnostic criteria for PTSD and persistent depressive disorder with anxious distress. (SMF ¶ 114.)

---

[9] Defendants deny this assertion because the page of the transcript referenced for support does not mention suicidal ideation. (Def. Reply to ASMF ¶ 48.) However, the prior page of the transcript supports the statement. (Currier Dep. at 97.)

Sometime in 2023 after the May Agreement was executed, Plaintiff told H.R that the way she was being treated was "not okay." (SMF ¶ 37.) She told H.R. that she was being mistreated by Kjaer, that it was making her sick, and that the behavior had to stop. (ASMF ¶¶ 56-57.) She believes that she described Kjaer's behavior as "sexist," but is not certain she used that word or the word "discriminatory." (*See* SMF ¶¶ 90-91; Pl. Response to SMF ¶¶ 90-91; Pl. Dep. at 12-18.)

In a July 2023 email to Kjaer's counsel, Plaintiff's counsel expressed his belief that Kjaer was violating the May Agreement, and that Plaintiff had been and was being retaliated against by Kjaer in violation of state and federal law. (SMF ¶ 100; ASMF ¶ 49.) H.R. was not informed of this complaint. (SMF ¶ 36; Pl. Response to SMF ¶ 36; Fish Dep. at 151, ECF No. 26-51.) ElleVet's Employee Handbook contains a policy against sexual harassment, sets out procedures for making a complaint, and provides that investigation of such a complaint will be conducted promptly. (ASMF ¶ 62.)

Plaintiff objected to an investigation of her claims against Kjaer being conducted by an attorney whom Kjaer selected and suggested that an investigation might not be necessary. (*See* SMF ¶ 102; Pl. Response to SMF ¶ 102; Currier Dep. at 82-84; Currier Dep. Ex. 3, ECF No. 26-75.) Ultimately, no investigation occurred. (ASMF ¶ 63.)[10]

When asked to describe Kjaer's alleged retaliation, Plaintiff explained that if Kjaer was angry at her or if she "pushed back on . . . something at work, he would . . . make my

---

[10] Defendants deny this statement but offer no evidence to suggest that an investigation was conducted. (*See* Def. Reply to ASMF ¶ 63.)

14

life hell in many different ways." (*See* SMF ¶ 95; Pl. Response to SMF ¶ 95; Pl. Dep at 25.)  She elaborated that if she suggested an alternative that he did not like, he would retaliate by giving her the silent treatment and undermining her in front of other employees, or by deliberately leaving her out of meetings, and would tell her that she did not know anything because she had not worked in a big company like he had.  (*See* SMF ¶ 96; Pl. Dep. at 182.)  She described a pattern in which Kjaer would take something that she valued away from her if she disagreed with him.  (*See* SMF ¶ 97; Pl. Dep. at 263-64.)

In August 2023, Plaintiff was so distressed that she obtained a note from her psychiatrist requesting permission to work from home.  (SMF ¶¶ 103-04; ASMF ¶ 50; *see also* Pl. Dep. at 46; Pl. Dep. Ex. 2, ECF No. 26-5.)  As a result, she was permitted to work from home.  (SMF ¶ 105.)

Plaintiff and Kjaer agreed to list their house for sale in September 2023, after Plaintiff's family concluded their long-planned visit with her.  (ASMF ¶ 65.)  Despite that agreement, just before Plaintiff's family was scheduled to arrive, Kjaer filed a lawsuit seeking to partition and force the sale of the house.  (*Id.*)  Plaintiff alleges that, after their break-up and before they sold their house, Kjaer refused to vacate the master bedroom and told her he could physically drag her out of the room, causing her to feel unsafe and move to another bedroom on a different floor of the house.  (SMF ¶ 111, ASMF ¶ 70.)[11]  She

---

[11] There is a dispute about whether this occurred.  (*See* ASMF ¶ 67; Pl. Dep. at 287-88; Def. Reply to ASMF ¶ 67; Kjaer Dep. I at 111-12.)

alleges that Kjaer was hostile toward her, that he used his size to intimidate her, and that he refused to help prepare the house for a showing. (SMF ¶ 111.)

At some point, both Plaintiff and Kjaer suggested that Williams assist with the dynamic at work by crafting a new role for Plaintiff at ElleVet. (SMF ¶ 70.)[12] Williams believed that they were both trying to recruit him to form a majority over the management and future direction of the company. (SMF ¶ 71.)[13] Williams believed that Kjaer and Plaintiff had already developed the idea that she would move into a special advisor role. (*See* SMF ¶ 75; Williams Dep. at 66, ECF No. 26-44.)[14] Between August and October 2023, Plaintiff had a series of meetings with Williams during which they discussed a potential new role for her. (SMF ¶ 73.)[15] Plaintiff provided Williams with a list of conditions she would want in the position, including the title of senior advisor, and guaranteed income goals; she also expressed concern about how her transition would be portrayed to the outside world. (*See* SMF ¶¶ 76-77, 80.)[16]

---

[12] Plaintiff denies this statement but offers no evidence that contradicts Williams's testimony. (*See* Pl. Response to SMF ¶ 70.)

[13] Plaintiff denies SMF ¶ 71 but offers no evidence that contradicts Williams's testimony about his perceptions. (*See* Pl. Response to SMF ¶ 71.)

[14] Williams testified that he thought the special advisor role had been referenced in the May Agreement. (Williams Dep. at 66.) In denying SMF ¶ 75, Plaintiff points out that the May Agreement did not transfer her to the role of special advisor. (Pl. Response to SMF ¶ 75.) Plaintiff does not, however, point to evidence otherwise contradicting Williams's testimony regarding his understanding.

[15] Plaintiff "denies the implication that these were innocuous discussions about a potential new role in the company." (*See* Pl. Response to SMF ¶ 73.) But she offers no evidence that contradicts Williams's testimony that they discussed the creation of a new role for her.

[16] Plaintiff asks the Court to strike SMF ¶¶ 76-77 and 80-81 under Federal Rule of Evidence 408 on the grounds that the statements refer to communications made during compromise negotiations about the claims that are the subject of this lawsuit. (Pl. Response to SMF ¶¶ 76-77, 80-81.) As Defendants point out, Rule 408 only bars such evidence when offered "to prove or disprove the validity or amount of a disputed claim

During a meeting in August, Plaintiff expressed concerns to Williams about Kjaer's performance and management style.  (SMF ¶ 74.)  Plaintiff also told Williams that Kjaer was mistreating her.  (*See* ASMF ¶ 55.)[17]  She told Williams that Kjaer was "consistently demeaning, dismissive, [and] abusive" and it was "making [her] sick, and it was soul destroying."  (SMF ¶¶ 92-93.)  She believes she also told him that Kjaer's behavior was sexist.  (*See* SMF ¶¶ 92, 94; Pl. Dep. at 22.)

During the fourth quarter of 2023, the ElleVet Board approved the compensation package for the position of Chief Commercial Officer.  (SMF ¶ 78.)  By late October or early November 2023, Plaintiff had been relieved of almost all her day-to-day duties for ElleVet; she was no longer included in meetings or consulted on decisions, and her access to social media and customer service software was terminated.  (ASMF ¶ 33.)[18]

---

or to impeach[.]"  *See* Fed. R. Evid. 408(a).  Defendants claim that the evidence at issue may be admitted under Rule 408(b) because it is offered for other purposes – to show that the parties recognized Plaintiff would be better-suited for a role outside of day-to-day management, and "on the issue of timing."  (Def. Response to Requests to Strike.)  Whether the statements refer to Plaintiff's offer to accept a "valuable consideration" in compromise of a "disputed claim" within the meaning of Rule 408 is unclear.  Although Plaintiff maintains that the Rule applies to the statements, she does not explain which, if any, of her claims against ElleVet were ripe at the time of her discussions with Williams.  *See* David P. Leonard, *The New Wigmore: Selected Rules of Limited Admissibility* § 3.7.2(b)(2) (2002) (observing that the exclusionary rule does not apply before a controversy exists).  Regardless, the Court concludes that on the current record, SMF ¶¶ 76-77 and 80 have little, if any, probative value as implied recognitions regarding the strength of Plaintiff's claims in this lawsuit, and the Court will consider the evidence, at least at this stage, under Rule 408(b).  *See id.* § 3.2.3 (recognizing that although Rule 408 "generally forbids consideration of compromise evidence as an implied recognition of fault, it is necessary for the court to evaluate the relevance of such evidence for that purpose in order to determine the admissibility of the evidence for a proper purpose").  The Court disregards SMF ¶ 81 because it is not material.

[17] Defendants deny this statement because it is not supported by the specific pages of the transcript Plaintiff cites.  (Def. Reply to ASMF ¶ 55.)  However, other parts of Plaintiff's deposition transcript do support the statement.  (*See* Pl. Dep. at 19-24.)

[18] Defendants qualify this statement, pointing to the discussions between Plaintiff and Williams regarding a potential role for Plaintiff that did not require day-to-day involvement with the company.  (*See* Def. Reply to ASMF ¶ 33.)

On January 1, 2024, ElleVet converted to a Delaware corporation called ElleVet Sciences, Inc., and Plaintiff, Kjaer, and Williams became the company's three directors (Complaint ¶ 10; SMF ¶ 12.)  Plaintiff, Kjaer, and Intellivet Capital Partners (owned by Williams and his partner) are the sole owners of Portland Technology Holdings, LLC, which in turn owns 100% of ElleVet.  (Complaint ¶ 10.)

**F.      Plaintiff's Second Termination**

On January 8, 2024, Plaintiff served a notice of claim on Kjaer and ElleVet alleging retaliation and discrimination (among other things).  (*See* ASMF ¶¶ 71-72; Gaythwaite Dec. Ex. 6.)  Around that same time, Kjaer told Plaintiff she could not attend a conference on behalf of ElleVet, which conference she had attended in prior years.  (*See* ASMF ¶¶ 26-27; Kjaer Dep. I at 49.)

Through a January 18, 2024, email to Plaintiff and Williams, Kjaer sent a meeting agenda and proposed a motion calling for the termination of Plaintiff's employment with ElleVet.  (Complaint ¶ 112.)  The motion was to be considered at a Board meeting scheduled for January 22, 2024.  (*Id.*)  The Board meeting was held as scheduled; Plaintiff, Kjaer, Williams, and ElleVet's counsel were present.  (Complaint ¶ 113.)  Kjaer and Williams voted to terminate Plaintiff's MSA and employment thereunder.  (ASMF ¶ 73.)  The reason given for the termination was that Plaintiff's job had become obsolete.  (SMF ¶ 86; ASMF ¶ 75.)[19]

---

[19] Defendants claim that Plaintiff and Williams had previously discussed that when the Chief Commercial Officer was hired, Plaintiff's role as Chief Creative Officer would become obsolete.  (SMF ¶ 79; Williams Dep. at 115-16.)  Plaintiff  claims that the Chief Commercial Officer position had been under discussion for years and was never intended to replace her.  (ASMF ¶ 105; Pl. Dec. ¶ 24.)

The person hired as Chief Commercial Officer was an employee of the company. (ASMF ¶ 76.) Several months later, that person was fired. (ASMF ¶ 77.) Since then, the position of Chief Commercial Officer has not been filled. (ASMF ¶ 78.)

Prior to the termination of her employment, Plaintiff did not hire or pay assistants. (ASMF ¶ 29.) She had no business or occupation separate from her position at ElleVet. (ASMF ¶ 30.) ElleVet provided Plaintiff with health insurance and paid time off. (ASMF ¶ 31.) Kjaer knew that Plaintiff needed an income, and he knew that she was going to lose her salary and her health insurance when her employment was terminated. (ASMF ¶ 74.)[20]

After Plaintiff was fired, her health insurance provider notified her that she no longer qualified for insurance through ElleVet. (ASMF ¶ 32.) She also lost access to her ElleVet laptop, email system, software, and shared drive, and ElleVet's outside vendors and consultants. (ASMF ¶ 28.) Plaintiff was not allowed to say goodbye to colleagues and co-workers. (*See* ASMF ¶ 83; Def. Reply to ASMF ¶ 83; Pl. Dec. ¶ 14.) Plaintiff has not been permitted back into ElleVet's offices. (ASMF ¶ 79.) Her biography has been removed from ElleVet's website. (*See* ASMF ¶ 82; Def. Reply to ASMF ¶ 82; Fish Dep. at 142.) Plaintiff was paid everything she was owed under the MSA. (SMF ¶ 88.) She remains on ElleVet's Board. (*See* SMF ¶ 87.)[21]

---

[20] Although Defendants deny this statement, (Def. Reply to ASMF ¶ 74), the statement is supported by the evidence that Plaintiff cites, (Kjaer Dep. I at 52), and Defendants have offered no contradictory evidence – only a suggestion that Kjaer did not have specific information about Plaintiff's finances. (Kjaer Dep. I at 53.)

[21] Defendants assert that Plaintiff's role on ElleVet's Board remains "unchanged." (SMF ¶ 87.) Plaintiff denies this assertion, claiming that she does not have the same access to information as Kjaer and Williams, the other two Board members, and that her requests for information have been ignored. (Pl. Response to SMF ¶ 87; *see also* ASMF ¶ 103.) In support, she references an email exchange among the Board members

In January 2025, Kjaer voluntarily resigned as CEO of ElleVet. (*See* SMF ¶ 83; Kjaer Dep. I at 27.)  Since that time, Kjaer has retained his access to ElleVet's emails, and he has been able to work in ElleVet's offices even though the new CEO has asked him not to do so. (*See* ASMF ¶¶ 80-81.)[22]  Kjaer was replaced by a female CEO. (SMF ¶ 84.) When the incoming CEO drafted a press release acknowledging Plaintiff's contributions, Kjaer refused to let it be published, even though the incoming CEO told Kjaer she thought it was important for Plaintiff's contributions to be recognized and asked to include references to Plaintiff. (ASMF ¶¶ 84-85.)  Kjaer permitted the publication of a press release that only contained references to him. (ASMF ¶ 86.)

On March 13, 2024, Plaintiff filed a complaint against ElleVet and Kjaer with the Maine Human Rights Commission (MHRC) and the Equal Employment Opportunity Commission (EEOC). (Complaint ¶ 6.)  Plaintiff claims that Kjaer responded to this complaint by saying, "I cannot wait [to] tear you apart in court" in a way that frightened her. (*See* SMF ¶¶ 46, 112; Pl. Interrogatory Answer No. 17.)  The MHRC and the EEOC issued Plaintiff right-to-sue letters. (Complaint ¶ 7.)

### PROCEDURAL BACKGROUND

In December 2024, Plaintiff filed a nine-count complaint against Kjaer and ElleVet in state court.  Defendants removed the matter to federal court.

---

in which she expressed several concerns, and Kjaer said he did not want to engage with or spend time on her concerns at an upcoming Board meeting. (Kjaer Dep. Ex. 2, ECF No. 26-38.)

[22] Defendants deny that the new CEO has asked Kjaer not to come into the office, (Def. Reply to ASMF ¶ 81), but the evidence referenced by Plaintiff supports this statement, (Fish Dep. at 138-39), and Defendants have not offered any contradictory evidence.

In Count I, Plaintiff asserts that Kjaer and ElleVet violated the Maine Whistleblowers' Protection Act (MWPA), 26 M.R.S. § 831, *et seq.*, as enforced through the Maine Human Rights Act (MHRA), 5 M.R.S. § 4551, *et seq.* She claims that she engaged in whistleblowing activity under the MWPA, and that Defendants unlawfully retaliated against her by, among other things, limiting her role at ElleVet, then terminating her employment. In Counts II and III, Plaintiff seeks damages from ElleVet for violations of the MHRA, 5 M.R.S. § 4551, *et seq.*, consisting of alleged harassment, retaliation, and discrimination based on disability and gender. In Count IV, Plaintiff seeks damages from ElleVet for alleged retaliation and coercion in violation of the MHRA, specifically 5 M.R.S. § 4633. In Count V, Plaintiff seeks damages from ElleVet for alleged gender-based harassment, discrimination, and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* In Count VI, Plaintiff seeks damages from ElleVet for alleged retaliation and discrimination based upon disability in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, *et seq.* In Count VII, Plaintiff brings a claim against Kjaer for intentional infliction of emotional distress. In Count VIII, Plaintiff seeks damages from ElleVet based on a theory of unjust enrichment. In Count IX, Plaintiff seeks damages from ElleVet, alleging a violation of Maine's wage and hour laws, 26 M.R.S. §§ 626, 626-A.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "'existence of *some* alleged factual dispute between the parties

21

will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.'" *Charette v. St. John Valley Soil & Water Conservation Dist.*, 332 F. Supp. 3d 316, 327 (D. Me. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). "An issue is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson*, 477 U.S. at 248). And facts are "material when they have the potential to affect the outcome of the suit under the applicable law." *Quintana-Dieppa v. Dep't of Army*, 130 F.4th 1, 7 (1st Cir. 2025) (quotation marks and citations omitted).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion" and identifying the parts of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In evaluating whether this burden is met, the court "must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor." *Berry v. City of South Portland*, 525 F. Supp. 2d 214, 226 (D. Me. 2007). If the moving party makes the required preliminary showing, the burden shifts to the nonmoving party, who must "'produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue.'" *Charette*, 332 F. Supp. 3d at 327 (quoting *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999)). "'As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment for the moving party.'" *Id.* (quoting *In re Ralar Distribs., Inc.*, 4 F.3d 62, 67 (1st Cir. 1993)).

22

"'However, summary judgment is improper when the record is sufficiently open-ended to permit a rational factfinder to resolve a material factual dispute in favor of either side.'" *Id.* (quoting *Morales-Melecio v. United States DHHS*, 890 F.3d 361, 368 (1st Cir. 2018)).

## DISCUSSION

### A.     Plaintiff's Employment Status

One of the issues central to Plaintiff's employment discrimination and retaliation claims is whether Plaintiff was as an ElleVet employee.  The parties agree that Title VII, the MHRA, and the MWPA extend their protections against employment discrimination only to "employees."  *See* 42 U.S.C. § 2000e-2, 3; 5 M.R.S. § 4572(1)(A); 26 M.R.S. § 833(1).  They agree that Title VII and the MHRA define the term "employee" in an identical fashion.  *See* 42 U.S.C. § 2000e(f); 5 M.R.S. § 4553(3).  They also agree that whether Plaintiff was an ElleVet employee for purposes of her Title VII and MHRA claims turns on common law agency principles, as articulated by the Supreme Court in *Clackamas Gastroenterology Associates, P.C. v. Wells*, 538 U.S. 440 (2003).[23]

---

[23] There is less agreement regarding Plaintiff's status as an "employee" under the MWPA—which defines the term "employee" differently than the other statutes.  *See* 26 M.R.S. § 832(1).  ElleVet argues that the meaning of "employee" under the MWPA should be consistent with the meaning of that same term in the MHRA—despite the distinct definitions supplied by the two statutes—and informed by the factors set forth in *Clackamas*.  ElleVet contends that only an "employee" under the MHRA may bring a MWPA claim because the MHRA provides the private cause of action for violation of the MWPA.  Plaintiff focuses on the specificity of the definition in 26 M.R.S. § 832(1) and contends that she qualifies as an employee under that definition because she "performed services for wages" under a "contract of hire."  *See id.*  She insists that her MWPA claim should survive summary judgment even if she does not qualify as an "employee" pursuant to the *Clackamas* factors.

23

## 1.    The Common Law Agency Test

"Title VII defines an 'employee' only as 'an individual employed by an employer.'" *Lopez v. Massachusetts*, 588 F.3d 69, 83 (1st Cir. 2009) (quoting 42 U.S.C. § 2000e(f)).  The MHRA provides the same definition.  5 M.R.S. § 4553(3).  This definition "is completely circular and explains nothing." *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992).

"A series of Supreme Court decisions have established that when a [federal] statute contains the term 'employee' but does not define it, a court must presume that Congress has incorporated traditional agency law principles for identifying master-servant relationships." *Lopez*, 588 F.3d at 83 (quotation marks omitted); *see also id.* at 83 n.13 (acknowledging that the archaic term "master-servant" refers to the employer-employee relationship).  The same presumption applies to the term "employee" as used in the MHRA.  *See Berry*, 525 F. Supp. 2d at 227 ("Maine courts have relied on federal case law surrounding Title VII for the purpose of construing and applying the provisions of the MHRA."); *Gavrilovic v. Worldwide Language Res., Inc.*, 441 F. Supp. 2d 163, 175 (D. Me. 2006) (applying common law agency test to determine whether plaintiff was an employee for purposes of both the MHRA and Title VII).

Under the common law agency test, the relevant factors focus on the employer's control over the employee.  *See Clackamas*, 538 U.S. at 448 (citing Restatement (Second) of Agency § 2(2) (1957)).  The roles are not mutually exclusive: "a working owner can wear two hats, as an employer and an employee." *See Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon*, 541 U.S. 1, 16 (2004) (discussing definitions supplied by the

24

Internal Revenue Code and the Employee Retirement Income Security Act of 1974). When evaluating the broad question of who qualifies as an employee, and the narrower question of whether an owner might also be an employee, courts consider guidelines issued by the EEOC. *See Clackamas*, 538 U.S. at 449-50. Although no single factor is determinative, the following non-exclusive list of factors suggest that a worker is an employee:

- The employer has the right to control when, where, and how the worker performs the job.
- The work does not require a high level of skill or expertise.
- The employer furnishes the tools, materials, and equipment.
- The work is performed on the employer's premises.
- There is a continuing relationship between the worker and the employer.
- The employer has the right to assign additional projects to the worker.
- The employer sets the hours of work and the duration of the job.
- The worker is paid by the hour, week, or month rather than the agreed cost of performing a particular job.
- The worker does not hire and pay assistants.
- The work performed by the worker is part of the regular business of the employer.
- The employer is in business.
- The worker is not engaged in his/her own distinct occupation or business.
- The employer provides the worker with benefits such as insurance, leave, or workers' compensation.
- The worker is considered an employee of the employer for tax purposes (i.e., the employer withholds federal, state, and Social Security taxes).
- The employer can discharge the worker.
- The worker and the employer believe that they are creating an employer-employee relationship.

EEOC Compliance Manual § 2-III(1), 2009 WL 2966755 (Aug. 6, 2009). These factors gauge whether the employer "'controls the means and manner of the worker's . . . performance.'" *Id.*

On the narrower question of whether an owner qualifies as an employee, the following factors are also relevant (but not exhaustive):

25

- Whether the organization can fire the individual or set the rules and regulations of the individual's work[.]
- Whether and, if so, to what extent the organization supervises the individual's work.
- Whether the individual reports to someone higher in the organization[.]
- Whether and, if so, to what extent the individual is able to influence the organization[.]
- Whether the parties intended that the individual be an employee, as expressed in written agreements or contracts[.]
- Whether the individual shares in the profits, losses, and liabilities of the organization[.]

*Id.* § 2-III(1)(d). These factors assess "whether the individual acts independently and participates in managing the organization, or whether the individual is subject to the organization's control." *Id.* The answer to this question depends on all aspects of the relationship; no single feature is determinative. *Clackamas*, 538 U.S. at 451. For this reason, "questions of employee status are not to be determined on the basis of a label, but rather on the basis of the actual circumstances of an individual's relationship with the company." *De Jesus v. LTT Card Servs., Inc.*, 474 F.3d 16, 23 n.11 (1st Cir. 2007).

### 2.    The Relationship Between Plaintiff and ElleVet

In this case, several of the aspects of the relationship between Plaintiff and ElleVet might suggest that Plaintiff was not an employee. First, Plaintiff's role as a member of the Board gives her influence over ElleVet's operations: Plaintiff holds one of three votes regarding the management of ElleVet's business. She has been able to influence the organization, as demonstrated by the occasions when she was part of the two-person majority on matters before the Board. She continues as a Board Member despite her termination as Chief Creative Officer. Second, Plaintiff's MSA was subject to termination only upon a majority vote of the Board. She had a say in the decision that resulted in the

26

termination of her MSA.  Third, Plaintiff's MSA provided that her compensation as Chief Creative Officer would be in the form of guaranteed payments for her services as a member, rather than wages for her services as an employee.  ElleVet did not make deductions or withhold for employment taxes.

Other aspects of Plaintiff's relationship with ElleVet suggest that Plaintiff was an employee.  First, the method of payment, the benefits Plaintiff received, and the "tools and equipment" used by Plaintiff as Chief Creative Officer are suggestive of an employer-employee relationship.  Plaintiff was paid monthly for her services as Chief Creative Officer, rather than an agreed sum for performance of a particular task.  Despite the text of the MSA, Plaintiff was paid separately for services as an ElleVet manager and for distributions she received as a member of ElleVet.  ElleVet also provided Plaintiff with benefits, including health insurance and paid time off, and it furnished the laptop and software that Plaintiff used to perform her work.  When Plaintiff's MSA was terminated, she lost those benefits and the equipment even though she remained as a Board Member.

Second, Plaintiff's work for ElleVet was part of the regular business of ElleVet, and Plaintiff was not engaged in her own distinct occupation or business; she worked for ElleVet, more or less continuously, from its founding in 2016 until her second termination in 2024; she did not hire or pay any assistants.

Third, and perhaps most significantly, Kjaer, as ElleVet's CEO, set at least some of the parameters regulating Plaintiff's work, and exercised some degree of control over when, where, and how Plaintiff performed her job as Chief Creative Officer.  The May Agreement underscores this as one point of emphasis in the agreement was Plaintiff's

acknowledgement that Kjaer was CEO.  In her role as Chief Creative Officer, Plaintiff was subject to Kjaer's guidance, and he could ask her to perform or not perform certain tasks. Relatedly, while Plaintiff might have had some discretion to choose to work remotely, when she pursued remote work as an accommodation in 2023, she did not do so unilaterally; she requested permission and ElleVet granted that request.  In January 2024, Kjaer also told Plaintiff she could not attend a conference on ElleVet's behalf, which conference she had attended in prior years.  In short, the evidence could support a finding that Plaintiff did not have the control that is arguably more often reflective of non-employee status.[24]

Overall, the record includes facts that could support a finding that Plaintiff was an employee while other facts could support a finding that she was not an employee.  Genuine factual disputes also exist as to some of the factors relevant to such a determination, including the factors that inform the degree of control that Kjaer exercised over Plaintiff at work.  In other words, there are genuine issues of fact material to the question of Plaintiff's employment status.  Summary judgment on the issue, therefore, is not appropriate.[25]

---

[24] There are multiple disputed facts regarding the degree of control that Kjaer exercised over Plaintiff.  For example, Plaintiff claims that Kjaer told her to whom she could and could not speak at work; Kjaer denies having done this.  It is unclear whether Plaintiff and her counsel had a meaningful degree of input into the terms of the May Agreement as Plaintiff testified at one point, or whether Kjaer essentially dictated its terms as she testified at another point.  (*Compare* Pl. Dep. at 227 *with* Pl. Dep. at 244-45.)  The parties also present different perspectives regarding the reduction in the scope of Plaintiff's day-to-day role at ElleVet in the fall of 2023. Plaintiff describes this reduction as a unilateral action in which ElleVet "drastically changed the conditions of her employment."  (Pl. Opp. to ElleVet's MSJ at 16, ECF No. 39.)  Defendants point out that Plaintiff had been engaged in discussions about changing her role in the fall of 2023, suggesting that she was involved in the "plans for her removal[.]"  (ElleVet's Reply Memo at 5, ECF No. 42.)

[25] There is no need to resolve the apparent tension between the MWPA's definition of "employee" and the definition of that same term in Title VII and the other related statutes at this time.  Defendants have not

### B.    Plaintiff's Retaliation Claims

In Count I of the complaint, Plaintiff asserts a claim against ElleVet for retaliation in violation of the MWPA, 26 M.R.S. §§ 831-840, as enforced through the MHRA, 5 M.R.S. § 4572(1)(A), which extends its protections to employees.[26]  Pleading in the alternative, in Count IV, Plaintiff asserts a claim against ElleVet for retaliation in violation of the MHRA, specifically 5 M.R.S. § 4633, which extends its protections to individuals who are not employees.  In Count V, Plaintiff asserts a cause of action against ElleVet for retaliation in violation of Title VII of the 1964 Civil Rights Act.  The retaliation claims are properly evaluated together.

The analysis of Plaintiff's Title VII retaliation claim is informed by the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). *Kinzer v. Whole Foods Mkt., Inc.*, 99 F.4th 105, 115 (1st Cir. 2024).  Initially, Plaintiff must make out a prima facie case by showing that "(1) [she] engaged in protected conduct, [and] (2) the employer took an adverse employment action, which was (3) in response to the employee's protected activity." *Id.*  "From there, the burden shifts to the defendant to articulate a legitimate, non-retaliatory explanation for its actions." *Id.* (quotation marks and citation omitted).  Then, the burden returns to the plaintiff, to show that the defendant's

---

established that Plaintiff was not an employee within the meaning of the MWPA, whether the assessment of employee status turns on the common law agency test and the *Clackamas* factors as Defendants contend or turns on the distinct definition supplied by the MWPA as Plaintiff contends.

[26] In Count I, Plaintiff also asserts a cause of action against Kjaer individually.  For the reasons set forth in Kjaer's motion, and as Plaintiff acknowledged at oral argument, Kjaer is entitled to summary judgment on that claim: he may not be held individually liable for a retaliation claim under the MWPA.  *See Fuhrmann v. Staples Office Superstore E., Inc.*, 58 A.3d 1083, 1098 (Me. 2012).

explanation is pretextual. *Id.* At the summary judgment stage, a plaintiff "need not prove retaliation by a preponderance of the evidence." *Id.* (quotation marks and citation omitted). Instead, a plaintiff "need only raise a genuine issue of fact as to whether retaliation motivated the adverse employment action." *Id.* (quotation marks and citation omitted).

The proof necessary for a retaliation claim based on a violation of the MWPA and the MHRA is similar. Plaintiffs must establish that: (1) they engaged in activity protected by the statute; (2) they suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action. *Hall v. President & Trs. of Bates Coll.*, No. 2:22-cv-00090-JAW, 2022 WL 17485903, at *21 (D. Me. Dec. 7, 2022). "In the context of the summary judgment analysis, the employee's burden of proving a prima facie case of retaliation is relatively light, and requires only a small showing that is not onerous and is easily made." *Johnson v. York Hosp.*, 222 A.3d 624, 631 (Me. 2019) (quotation marks and citation omitted).

When evaluating whether a MWPA claim survives summary judgment, the Maine Supreme Judicial Court does not use the *McDonnell Douglas* burden-shifting framework but instead employs a "unitary examination" analyzing "whether the employee has presented evidence of each of the three elements of the claim." *Cormier v. Genesis Healthcare LLC*, 129 A.3d 944, 948 n.2 (Me. 2015).[27]   Whether this Maine-specific

---

[27] The Law Court apparently has not had occasion to consider "whether there is any reason *not* to disengage the *McDonnell Douglas* paradigm from sex-based discrimination claims" under the MHRA, or retaliation claims under the MHRA. *See Johnson*, 222 A.3d at 632 (declining to reach that question in a sex discrimination case where the summary judgment record did not permit plaintiff to satisfy even the initial requirements of the framework).

30

retaliation paradigm addresses a matter of state substantive law  is unclear.  *See Theriault v. Genesis HealthCare LLC*, 890 F.3d 342, 349 n.4 (1st Cir. 2018).  Regardless, "all roads lead to Rome: in the final analysis, the Maine-specific retaliation paradigm obligates the plaintiff to adduce precisely the same quantum of proof that she would have had to adduce to defeat summary judgment under the *McDonnell Douglas* framework."  *Id.* at 351.

### 1.    Protected Conduct

Protected conduct under 42 U.S.C. § 2000e-3(a) includes "'oppositional conduct,' or 'informally opposing an employment activity that might violate Title VII.'"  *MacDonald v. Brewer Sch. Dep't*, 651 F. Supp. 3d 243, 262 (D. Me. 2023) (citing *Ray v. Ropes & Gray LLP*, 799 F.3d 99, 107-08 (1st Cir. 2015)).  Under the MWPA and the MHRA, protected activity is similarly defined.  The MWPA protects an employee's report to her employer concerning "what the employee has reasonable cause to believe is a violation" of state or federal law.  26 M.R.S. § 833(1)(A).  "Although the MWPA does  not define 'report', the MWPA has been interpreted so that '[a] protected activity is broadly defined as conduct by [the plaintiff] that is in opposition to an unlawful employment practice of the defendant.'"  *Osher v. Univ. of Me. Sys.*, 703 F. Supp. 2d 51, 66 (D. Me. 2010) (quoting *Curtis v. Sullivan Tire, Inc.*, 584 F. Supp. 2d 204, 212 (D. Me. 2008)).  The MHRA similarly provides that "[a] person may not discriminate against any individual because that individual has opposed any act or practice that is unlawful under [the MHRA] or because that individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under the [MHRA]."  5 M.R.S. § 4633(1).

31

The category of oppositional conduct covered by these statutes is construed broadly: when "an employee communicates to her employer a belief that the employer has engaged in a form of employment discrimination, that communication virtually always constitutes" oppositional conduct that qualifies for protection as long as the communication "would qualify in the minds of reasonable jurors as resistant or antagonistic to the unlawful employment practice." *Kinzer*, 99 F.4th at 115-16 (quotation modified); *accord Osher*, 703 F. Supp. 2d at 66 (discussing the scope of oppositional conduct under the MWPA); *Thompson v. MaineHealth*, 656 F. Supp. 3d 251, 258 (D. Me. 2023) (indicating that protected activity within the meaning of the MHRA "is broadly defined as conduct by the plaintiff that is in opposition to an unlawful employment practice of the defendant"). To prevail on a retaliation claim, a plaintiff is not required to prove that the protested conditions actually constituted an unlawful employment practice. *Kinzer*, 99 F.4th at 115; *Osher*, 703 F. Supp. 2d at 66. A plaintiff's complaints "need only rest on a good faith, reasonable belief that the . . . employer violated the law." *Kinzer*, 99 F.4th at 115 (quotation marks and citation omitted); *accord Osher*, 703 F. Supp. 2d at 66. The law, however, does "not protect generally against" personal hostilities or "unfair treatment in private employment, but only against actions motivated by listed prejudices such as . . . gender." *Sabinson v. Trs. of Dartmouth Coll.*, 542 F.3d 1, 4 (1st Cir. 2008).

During her deposition, Plaintiff testified that she believed that she told both Williams and H.R. that Kjaer's conduct toward her was sexist – although she was not entirely certain she used that word. (*See* Pl. Dep. at 12-22, 304-05.) She alleges that she engaged in protected conduct by complaining about Kjaer's behavior to H.R., to Williams,

and through counsel in July 2023.  ElleVet apparently concedes that the email Plaintiff's counsel sent in July 2023 qualifies as protected oppositional conduct.  (ElleVet's MSJ at 15.)  Plaintiff has offered sufficient evidence to make out the first element of her retaliation claims.

### 2.    Adverse Action

Plaintiff has also offered sufficient evidence regarding the second element of her retaliation claims.  Her January 2024 "termination was obviously an adverse action." *Kinzer*, 99 F.4th at 117.  And, even before the termination of her employment, in the fall of 2023, she was relieved of nearly all duties for ElleVet, excluded from meetings, denied input into decisions, and denied access to ElleVet's customer service software and its social media accounts.  This reduction in the scope of Plaintiff's role might also qualify as an adverse action.  *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68-69 (2006) (defining adverse employment action as an action that "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination" and providing examples); *Blackie v. Maine*, 75 F.3d 716, 725 (1st Cir. 1996) (providing examples of materially adverse employment actions, including divesting an employee of significant responsibilities).

### 3.    Causation

"To demonstrate a causal link sufficient to defeat a summary judgment motion," a plaintiff "must make a sufficient evidentiary showing that her protected activity . . . was a substantial, even though perhaps not the only, factor motivating [her] dismissal." *Theriault*, 890 F.3d at 349 (quotation marks and citation omitted).  Temporal proximity

may be "sufficient to establish a prima facie case of causation" under the *McDonnell Douglas* framework applicable to Plaintiff's Title VII claim. *Collazo v. Bristol-Myers Squibb Mfg., Inc.*, 617 F.3d 39, 49 (1st Cir. 2010). But timing alone is insufficient "to forge a causal link strong enough to create an inference of causation" under the Maine-specific retaliation paradigm applicable to the MWPA claim "in the face of an employer's asserted legitimate non-retaliatory reason for the adverse employment action." *Theriault*, 890 F.3d at 352. Under the Maine-specific paradigm, temporal proximity between the protected conduct and the adverse action may support an inference of causation sufficient to withstand summary judgment when coupled with evidence suggesting that the plaintiff's employer knew about the protected conduct. *See Cormier*, 129 A.3d at 951.

With respect to the Title VII claim and the MHRA retaliation claim, the temporal proximity between counsel's July 2023 email, and (a) the reduction in the scope of Plaintiff's role several months later, and (b) Plaintiff's termination in January 2024 is sufficient to "meet the relatively light burden of establishing a prima facie case of retaliation." *Kinzer*, 99 F.4th at 117 (quotation marks omitted) (citing *DeCaire v. Mukasey*, 530 F.3d 1, 19 (1st Cir. 2008) for the proposition that satisfactory temporal proximity may exist where all of the events described took place within a one-year period). As for the MWPA claim, the same conclusion obtains: Plaintiff testified that she told Williams about Kjaer's sexist behavior, and he cast one of the two Board votes to terminate Plaintiff's MSA. With this evidence and the temporal relationship between Plaintiff's complaints and her termination—particularly the 10-day period between the service of Plaintiff's notices of claims on Kjaer and ElleVet on January 8, 2024, and Kjaer's January 18, 2024, proposal

that the Board vote to terminate Plaintiff's MSA—the record is sufficient to support a reasonable inference of causation.

ElleVet contends that Plaintiff cannot establish causation because Kjaer contemplated Plaintiff's departure from the business as early as December 2022, when he emailed Plaintiff to discuss her exit. ElleVet further asserts that all parties were discussing the end of Plaintiff's operational role at ElleVet in the fall of 2023.

Defendants' argument and the record, however, do not establish as a matter of law that the termination of Plaintiff's employment was "planned and not dependent on the complaint(s)" she made. *Cf. Sabinson*, 542 F.3d at 5. Kjaer's contemplation of Plaintiff's departure from the business before she complained about his conduct does not support a finding that Williams supported Plaintiff's termination before Plaintiff complained about Kjaer's behavior and served a notice of claim on Kjaer and ElleVet. *Cf. Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) ("Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."). In fact, the record suggests that the discussions between Plaintiff and Williams in the fall of 2023 concerned a change in her role, not the end of her employment.

Because a reasonable jury could conclude that Plaintiff's complaints about Kjaer's conduct motivated ElleVet's decision to terminate her MSA, Plaintiff has presented a prima facie case of unlawful retaliation under Title VII and the MHRA. Plaintiff has also presented sufficient evidence of the elements of her retaliation claims under the MWPA.

35

### 4.    Justification

Because Plaintiff has made her prima facie case, the burden on the Title VII claim and the MHRA claim shifts to ElleVet to present a nonretaliatory reason for reducing the scope of her role and terminating her position.   ElleVet suggests that Plaintiff's responsibilities were reduced in the fall of 2023 concurrent with discussions between Plaintiff and Williams about changing her role in the company.  (*See* Def. Reply to ASMF ¶ 33.)  As for Plaintiff's termination in January 2024, ElleVet explained that her position became obsolete when the company created and filled the Chief Commercial Officer position.  Defendants' explanations are sufficient to shift the burden back to Plaintiff.

### 5.    Pretext

On a Title VII claim, the pretext inquiry is whether the employer's proffered reasons for its action suffer from implausibility, inconsistency, incoherence, or contradiction such "that a reasonable factfinder could rationally find" the proffered reasons "unworthy of credence[.]"  *O'Horo v. Bos. Med. Ctr. Corp.*, 131 F.4th 1, 15 (1st Cir. 2025).  Plaintiff "must point to specific facts that would demonstrate to a reasonable jury" that ElleVet's stated reason for terminating her employment was "a sham or pretext" intended to mask its retaliatory motive.  *Kinzer*, 99 F. 4th at 118 (quotation marks omitted). There is no "mechanical formula" for determining whether pretext has been shown: the court must weigh all the evidence.  *Id.* (quotation marks omitted).

Here, the record contains ample support for a pretext finding.  For instance, Plaintiff has offered evidence that the Chief Commercial Officer position had been under consideration for years, but that when discussed, the plan did not contemplate that the new

36

position would replace the position of Chief Creative Officer. Furthermore, the person hired to fill the Chief Commercial Officer position was fired after several months in the role, and the position remains vacant, which could suggest that the position was created for the purpose of terminating Plaintiff's employment. When the record is viewed in the light most favorable to Plaintiff, a reasonable jury could find ElleVet's stated reason for terminating Plaintiff's employment unworthy of credence. As such, ElleVet is not entitled to summary judgment on Plaintiff's retaliation claims.

**C.    Plaintiff's Gender Discrimination Claims**

In Counts III and V of the complaint, Plaintiff asserts claims for sex discrimination in violation of state (Count III) and federal (Count V) law. Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to" the "terms, conditions, or privileges of employment, because of such individual's . . . sex[.]" 42 U.S.C. § 2000e-2(a)(1). The MHRA "similarly provides that it is unlawful employment discrimination for an employer to discriminate against an employee on the basis of sex 'with respect to . . . terms, conditions, or privileges of employment.'" *Berry*, 525 F. Supp. 2d at 227 (quoting 5 M.R.S. § 4572(1)(A)). The statutes target practices that discriminate, i.e.—treat a person differently—because of sex. *See Muldrow v. City of St. Louis*, 601 U.S. 346, 354-55 (2024).

"Maine courts have relied on federal case law surrounding Title VII" in the construction and application of the MHRA. *Berry*, 525 F. Supp. 2d at 227. For that reason, the Court "will apply the same legal standard in considering whether" Plaintiff's state and

federal gender discrimination claims survive summary judgment. *See id.* Under that standard—in the absence of direct evidence of gender discrimination—the *McDonnell Douglas* burden shifting framework is used to determine whether discrimination may be inferred from the undisputed facts. *See O'Horo*, 131 F.4th at 13.

### 1.     Plaintiff's Prima Facie Case

There is no dispute regarding the first two elements of Plaintiff's prima facie case: Plaintiff is female and therefore a member of a protected class, and as a founder of ElleVet, she was qualified for her role as Chief Creative Officer. *See Ripoli v. Dep't of Human Servs., Office of Veterans Servs.*, 123 F.4th 565, 571 (1st Cir. 2024) (identifying the elements of a prima facie showing of discrimination). Plaintiff has also established the third element—adverse employment action—her job responsibilities were limited, and her MSA was then terminated. *See id.* at 572 (discerning no serious dispute as to the adverse employment action element where employee was terminated).

The question is whether the circumstances of the adverse employment action permit an inference of discriminatory animus. Plaintiff submits that she has offered sufficient evidence to create a triable issue as to whether Kjaer subjected her to a hostile work environment based on sex—one way to establish violation of Title VII. *See Lipsett v. Univ. of P.R.*, 864 F.2d 881, 897 (1st Cir. 1988) (recognizing that sexual harassment, a form of sex discrimination actionable under Title VII, can take the form of hostile

environment harassment).[28]   ElleVet contends that Kjaer's treatment of Plaintiff was not based on her gender but was instead motivated by the personal feelings resulting from the parties' failed relationship and related power struggles.

> To prevail on a gender-based hostile work environment claim, a plaintiff must establish the following six elements: (1) unwelcome harassment that was (2) severe or pervasive, and (3) both objectively and subjectively offensive, and (4) that she was a member in a protected class, (5) that the harassment was motivated by sex, and (6) that there is a basis for employer liability.

*O'Horo*, 131 F.4th at 19 (quotation modified).

Plaintiff's hostile work environment claim is based on allegations that Kjaer told her she was too "emotional," demeaned her at work and disparaged her ideas, belittled her decision to stay home to raise her children, used vulgar, sexist language to describe women, downplayed concerns about sexist language used by others at work, including his brother, excluded Plaintiff from meetings and subjected her to the silent treatment, gaslighted her, and voted in favor of terminating her MSA.  The allegations describe a difficult working environment and personal retribution in the wake of a failed relationship.  Without more, the allegations might fall short of creating a triable issue of fact as to whether Kjaer engaged in harassing conduct toward Plaintiff based on her gender, particularly in light of Plaintiff's admission that Kjaer would disregard and talk over anyone who disagreed with him, regardless of gender.

---

[28] Plaintiff's objection to ElleVet's motion does not explicitly state that she is attempting to pursue a claim based on disparate treatment.  Because Plaintiff has generated a triable issue on a theory of hostile work environment, her gender discrimination claims survive Defendants' summary judgment request, regardless.

The record evidence, however, including Mandy Levine's expected expert testimony regarding implicit gender bias, which testimony includes citation to conduct that reflects that bias, is sufficient to permit a reasonable inference that the harassment Plaintiff alleges was motivated by gender-based discrimination. *Cf. Forrest v. Brinker Int'l Payroll Co., LP*, 511 F.3d 225, 229 (1st Cir. 2007) (rejecting false dichotomy in failed relationship case that "harassment could not have been motivated by the victim's sex because it was instead motivated by a romantic relationship gone sour" and concluding that reasonable jury could have concluded that harasser's conduct toward victim, in failed relationship case, was based on her sex when he barraged her with sexually-degrading, gender-specific epithets); *Charette*, 332 F. Supp. 3d at 352 (D. Me. 2018) (concluding that employee stated hostile work environment claim where record included evidence that supervisor made sexually explicit comment toward her and treated her differently because she was a female); *Lipsett*, 864 F.2d at 905 (concluding that plaintiff established existence of hostile environment by showing, among other things, that male residents subjected female residents to constant verbal attack motivated by anti-female animus).

The question then becomes whether the alleged harassment was sufficiently severe or pervasive to support a hostile work environment claim, an assessment informed by all of the circumstances, including the "'severity of the discriminatory conduct, its frequency, the extent to which the behavior is physically threatening or humiliating as opposed to a mere offensive utterance, and the extent to which it unreasonably interferes with an employee's work performance.'" *Charette*, 332 F. Supp. 3d at 352 (quoting *Franchina v. City of Providence*, 881 F.3d 32, 46 (1st Cir. 2018)); *see also Harris v. Forklift Sys., Inc.*,

40

510 U.S. 17, 22 (1993) ("Certainly Title VII bars conduct that would seriously affect a reasonable person's psychological well-being, but the statute is not limited to such conduct. So long as the environment would reasonably be perceived, and is perceived, as hostile or abusive, . . . there is no need for it also to be psychologically injurious.").

On the summary judgment record, which includes expert testimony as to the effect and significance of the harassing conduct, a reasonable fact finder could conclude that Kjaer subjected Plaintiff to demeaning and humiliating conduct for many months. Under the circumstances, the hostile work environment claim "is not so marginal that it can be decided by the Court on summary judgment"; the question of severity and pervasiveness is properly left to a jury. *Charette*, 332 F. Supp. 3d at 353.

### 2.    Justification and Pretext

As discussed in the context of Plaintiff's retaliation claims, ElleVet has met its burden of providing non-discriminatory reasons for limiting Plaintiff's responsibility and terminating her position, and Plaintiff has met her burden of showing that the proffered explanations might not be credible. Summary judgment is not appropriate because Plaintiff has offered evidence from which a rational jury could infer that gender discrimination informed ElleVet's decision to reduce the scope of her role and terminate her MSA. Whether ElleVet's reasons were, in fact, pretextual is an issue for trial. Consequently, ElleVet is not entitled to summary judgment on Plaintiff's gender discrimination claims.

### D.    Plaintiff's Disability Discrimination Claims

In Counts II and VI of the complaint, Plaintiff asserts claims for disability discrimination in violation of state (Count II) and federal (Count VI) law. "The ADA

41

prohibits covered employers from discriminating against a qualified individual with a disability." *Colon-Fontanez v. Municipality of San Juan*, 660 F.3d 17, 32 (1st Cir. 2011) (citing 42 U.S.C. § 12112(a)). Similarly, the MHRA makes it unlawful for an employer to discriminate against an employee on the basis of a disability. 5 M.R.S. § 4572. The prohibitions on discrimination found in the ADA and the MHRA are generally construed coextensively. *See Charette*, 332 F. Supp. 3d at 359 n.45.

Discrimination under the ADA and the MHRA includes not only adverse actions motivated by prejudice but also includes failing to make reasonable accommodations for a plaintiff's disabilities. 42 U.S.C. § 12112(b)(5)(A); 5 M.R.S. § 4553(2)(E). The ADA also prohibits retaliation against an employee who has requested a reasonable accommodation for a disability. *See* 42 U.S.C. § 12203(a).

Plaintiff has not stated a disparate treatment claim: she has not offered any non-conclusory evidence that ElleVet reduced her responsibilities or terminated her employment because of a disability. *See Freadman v. Metro. Prop. & Cas. Ins. Co.*, 484 F.3d 91, 99 n.7 (1st Cir. 2007) (describing elements of prima facie case of disparate treatment claim under the ADA). Furthermore, she claims that she was retaliated against for seeking an accommodation, but she has not offered evidence that would reasonably support such a claim. For instance, although Plaintiff contends that after she requested and received permission to work from home, she was unnecessarily and unreasonably excluded from meetings and decision-making, she has failed to provide any non-conclusory evidence to support her contention.

42

Plaintiff also claims that ElleVet discriminated against her by failing to accommodate her requests that Kjaer "cease his demeaning and abusive behavior, which exacerbated her PTSD." (Pl. Opp. to ElleVet's MSJ at 24.) To avoid summary judgment on her reasonable accommodation claim, Plaintiff must "'produce enough evidence for a reasonable jury to find that (1) [she] is disabled within the meaning of the ADA, (2) [she] was able to perform the essential functions of the job with or without a reasonable accommodation, and (3) [ElleVet], despite knowing of [her] disability, did not reasonably accommodate it.'" *Freadman*, 484 F.3d at 102 (quoting *Rocafort v. IBM Corp.*, 334 F.3d 115, 119 (1st Cir. 2003)).

A central issue at this stage is ElleVet's knowledge of the disability and Plaintiff's need for an accommodation. "The ADA imposes liability for an employer's failure to accommodate 'known physical or mental limitations' of an employee." *Id.* (quoting 42 U.S.C. § 12112(b)(5)(A)). "Ordinarily, the employer's duty to accommodate is triggered by a request from the employee" – a request that must be direct and specific and must explain how the accommodation sought is related to a disability. *Id.* "An employer need not provide accommodations where it does not know an employee has a disability." *Estades-Negroni v. Assocs. Corp. of N. Am.*, 377 F.3d 58, 64 (1st Cir. 2004). Plaintiff's complaints to H.R. and Williams regarding Kjaer's behavior cannot reasonably be characterized as requests for accommodation because the record lacks any evidence to support a finding that ElleVet "knew or reasonably should have known" that she was making a request because of a disability. *See Freadman*, 484 F.3d at 103.

43

The doctor's note that Plaintiff submitted in August 2023 (after her communication with H.R. in May 2023) does not mention her PTSD diagnosis, and she has not offered other evidence that she told H.R. or Williams about her diagnosis or that they were otherwise aware of the diagnosis. Although Plaintiff has offered evidence that she told them that Kjaer's behavior was making her sick, Plaintiff's statement cannot reasonably be viewed as notifying ElleVet that Plaintiff was seeking an accommodation for a disability. Moreover, even if H.R. and Williams were aware that Plaintiff was suffering from PTSD, the evidence cannot support a finding that she made an actionable, specific request of either H.R. or Williams that was not granted. Plaintiff made only one specific request for accommodation—a request to work from home—and that request was granted.

In the absence of a triable issue of material fact, ElleVet is entitled to summary judgment on Plaintiff's disability discrimination claims.

### E.    Plaintiff's Intentional Infliction of Emotional Distress Claim

In Count VII of the complaint, Plaintiff asserts a claim against Kjaer for the intentional infliction of emotional distress (IIED). To avoid summary judgment, Plaintiff must present facts sufficient to support the following:

> (1) the defendant intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from [his] conduct; (2) the conduct was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, utterly intolerable in a civilized community; (3) the actions of the defendant caused the plaintiff[] emotional distress; and (4) the emotional distress

44

suffered by the plaintiff was so severe that no reasonable [person] could be expected to endure it.

*Berry v. WorldWide Language Res., Inc.*, 716 F. Supp. 2d 34, 52-53 (D. Me. 2010) (quoting *Curtis v. Porter*, 784 A.2d 18, 22-23 (Me. 2001)).  Kjaer contends that Plaintiff cannot establish the second, third, and fourth elements of her IIED claim.

### 1.    Extreme and Outrageous Conduct

The question of whether the alleged facts are sufficient to allow a jury to find that a defendant's conduct is so extreme and outrageous to permit recovery "is a question of law for the court to decide."  *Argereow v. Weisberg*, 195 A.3d 1210, 1219 (Me. 2018) (quotation marks omitted).  In general, "courts play a . . . substantial screening role on the question of extreme and outrageous conduct . . . as a balance to the open-ended nature of this claim and the wide range of behavior to which it might plausibly apply."  Restatement (Third) of Torts § 46 cmt. g (2012); *accord Deane v. Central Me. Power Co.*, 322 A.3d 1223, 1237 (Me. 2024) (citing this portion of the Restatement for this proposition).

"To recover on a claim of intentional infliction of emotional distress the plaintiff must establish that the defendant's conduct was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious and utterly intolerable in a civilized community."  *Latremore v. Latremore*, 584 A.2d 626, 630 (Me. 1990) (quotation marks and citations omitted).

> Whether an actor's conduct is extreme and outrageous depends on the facts of each case, including the relationship of the parties, whether the actor abused a position of authority over the other person, whether the other person

was especially vulnerable and the actor knew of the vulnerability, the motivation of the actor, and whether the conduct was repeated or prolonged.

*Id.* cmt. d.

The outermost bounds of decency in human relationships are dependent on the nature of those relationships. *See Norton v. McOsker*, 407 F.3d 501, 509 (1st Cir. 2005) ("Generally, courts consider whether the relationship created sufficient vulnerability to create a duty on the part of the defendant to avoid inflicting emotional distress."). A few pertinent context-specific themes have emerged from the caselaw.

Courts in Maine have generally been reluctant to determine that workplace misconduct qualifies as extreme and outrageous. *See, e.g., Walton v. Nalco Chem. Co.*, 272 F.3d 13, 19 (1st Cir. 2001) (affirming conclusion that evidence did not establish extreme and outrageous conduct by employer who abused position of authority, threatened employee's livelihood by pressuring him to accept buy-out, and subjected him to undue humiliation by transferring his responsibilities to a less-experienced employee, publishing demeaning performance review, and repossessing company property from him in the presence of family and neighbors); *Gavrilovic v. World Wide Language Res., Inc.*, Civ. No. 05-38-P-H, 2005 U.S. Dist. LEXIS 32134, at *94-95 (D. Me. Dec. 8, 2005) (concluding that boorish, offensive, vulgar comments by company president about plaintiff did not "as a matter of law rise to the level necessary to sustain an IIED claim"); *Botka v. S.C. Noyes & Co., Inc.*, 834 A.2d 947, 950-53 (Me. 2003) (affirming determination on summary judgment that defendant did not engage in extreme and outrageous conduct by harassing plaintiffs, interfering with sales relationships, violating terms of asset purchase agreement,

46

and making working in the same office difficult); *Staples v. Bangor Hydro-Elec. Co.*, 561 A.2d 499, 501 (Me. 1989) (affirming summary judgment for defendant on IIED claim where plaintiff alleged that supervisor had humiliated him and demoted him without cause). *But cf. Clark v. Means*, No. Civ. A. CV-01-170, 2004 WL 1463048, at *3 (Me. Super. May 19, 2004) (concluding that record provided factual support for element of extreme and outrageous conduct and made the element a triable issue where plaintiff offered evidence that defendant, her supervisor, made repeated inquiries of her regarding her sex life, that she left her job to escape a situation she characterized as abusive and harassing, and that after she left her job, she asked defendant to stop calling her).

As for IIED in domestic relationships, "long-term romantic relationships frequently involve strong emotions and allow the parties to come to know each other well enough to know the other's vulnerabilities and how to exploit them[.]" *Norton*, 407 F.3d at 510. Although emotional turmoil understandably attends a break-up, breaking up by itself does not constitute outrageous conduct. *See id.* at 511. Courts and commentators also agree that infidelity between married persons (or unfaithfulness between unmarried domestic partners) does not qualify as extreme and outrageous conduct. *See* Restatement (Third) of Torts § 46 cmt. d ("[S]ome conduct that may be outrageous—for example, marital infidelity—is sufficiently common that it could not be characterized as extreme (although today it may also not be outrageous)."); Ira Mark Ellman & Stephen D. Sugarman, *Spousal Emotional Abuse as a Tort?* 55 Md. L. Rev. 1268, 1316-17 (1996) (recognizing that "many people in our society certainly consider engaging in this sort of infidelity to be one of the worst things spouses can do to each other" while perceiving sound policy reasons not to

47

recognize that behavior as an actionable tort); *see also McPherson v. McPherson*, 712 A.2d 1043, 1045 (Me. 1998) (rejecting contention that there is a duty for purposes of tort law to be sexually faithful in marriage).

Maine courts have found liability for IIED in domestic relationships where the fact patterns include physical abuse. *See, e.g., Graham v. Brown*, 26 A.3d 823 (Me. 2011) (affirming default judgment entered in favor of Graham where the record showed that Brown, her former romantic partner, committed frequent acts of physical and emotional abuse against her over a two-year period, including throwing her across a room so that she fell onto her face and jaw, shoving her into a cement step resulting in injuries to her spine, and punishing her young son in front of her by covering his mouth so that he could not breathe); *Henriksen v. Cameron*, 622 A.2d 1135 (Me. 1993) (affirming jury verdict for plaintiff in action for IIED against her former husband where the evidence showed that he had physically and emotionally abused her, including by raping and assaulting her); *Caron v. Caron*, 577 A.2d 1178 (Me. 1990) (affirming judgment for plaintiff on IIED claim against ex-husband where evidence showed that he physically abused her and her child).

An IIED claim, however, does not require physical contact. Vincent R. Johnson & Alan Gunn, *Studies in American Tort Law* 69-70 (4th ed. 2009). Nevertheless, in the context of domestic relationships, when the conduct challenged does not include instances of physical abuse, courts in Maine have been less likely to find liability for IIED. *See, e.g., Angelica v. Drummond Woodsum & MacMahon, P.A.*, No. Civ. A CV-02-15, 2003 WL 22250354, at *7 (Me. Super. Sept. 9, 2003) (concluding that plaintiff failed to establish extreme and outrageous conduct as a matter of law where she claimed that her former

48

romantic partner told her that the agreements they had executed were not legal, inappropriately handled disposition of their property, and left her for another woman). "In contrast to battery," where courts have been content to draw bright lines, "it is much more difficult to establish satisfactory standards to identify when emotional mistreatment is completely out of bounds." Ellman & Sugarman, *Spousal Emotional Abuse as a Tort?* 55 Md. L. Rev. at 1323.

The Maine Law Court's decision in *Lyman v. Huber* provides some guidance in the effort to determine whether the circumstances in this case are sufficient to support an IIED claim. In that case, the Law Court observed that "in the context of domestic relationships, recovery [for IIED] may be available in cases involving cumulative acts over an extended period that are in the nature of 'coercive, controlling behavior that invades important individual rights of the abused party[.]'" *Lyman v. Huber*, 10 A.3d 707, 713 (Me. 2010) (quoting Martha Chamallas & Jennifer B. Wriggins, *The Measure of Injury* 75 (2010)). Lyman sought damages for IIED against her former romantic partner, Huber, based on a course of emotionally abusive conduct by Huber over a period spanning more than ten years: he "never physically abused her, but he was commanding and intimidating to the point that she feared him and his anger." *Id.* at 710. The Law Court vacated a judgment in Lyman's favor, concluding that the element of severe emotional distress could not be inferred from the nature of the defendant's conduct alone, and that she had not offered proof that her emotional distress was so severe that no reasonable person could be expected to endure it. *Id.* at 713-14. While recognizing that an IIED claim "may be available to some victims" of emotional abuse in the context of domestic relations, the Court noted that

application of IIED in domestic relationships must "account for the sad reality that dysfunctional domestic relationships are not uncommon in modern society." *Id.* at 714.

Kjaer suggests that the Court analyze his behavior toward Plaintiff in the workplace separately from his treatment of Plaintiff in their private lives, perhaps in recognition of courts' assessment of claims in the separate contexts. But the relationship between Plaintiff and Kjaer was multi-faceted; they were romantic partners and co-founders of a business, where he was her supervisor in the day-to-day operation of the business. The court is not "obliged to balkanize the defendant's course of conduct, isolating its component parts and, in the bargain, minimizing their net effect." *Sindi v. El-Moslimany*, 896 F.3d 1, 21 (1st Cir. 2018).

In this case, a fact finder could reasonably conclude that Kjaer belittled Plaintiff's decision to stay home to raise her children, used vulgar language to describe women, dismissed her ideas as "dumb" or examples of "Amanda logic," interrupted and talked over her, excluded her at work from meetings and interviews, berated and demeaned her in front of staff, gave her the "silent treatment" for extended periods of time, attempted to force the sale of their home while her family was visiting, refused to vacate and threatened to remove her physically from the master bedroom, "gaslit" her many times (e.g., told her she was "crazy," did not remember things correctly), (*see* Pl. Dep. at 65-66, 73-74), and instituted measures to marginalize her role in and ultimately terminate her employment with a company that she co-founded. Kjaer's conduct can reasonably be viewed as designed to demean, humiliate, belittle, disrespect, and intimidate Plaintiff.

50

While the Court is mindful, as Plaintiff argues, that the proper analysis includes an examination of all the circumstances, cumulatively, the Court must acknowledge that in each of the contexts in which the conduct is alleged to have occurred (employment and domestic relationship), the law has recognized some practical considerations that limit the ability of a claimant to recover. And, as courts in Maine have observed, regrettably, "dysfunctional domestic relationships" are not uncommon. *See Lyman*, 10 A.3d at 714.

The Law Court's decision in *Lyman* recognizes, however, that the existence of dysfunctional domestic relationships should not be a reason for the law to permit a person to intentionally engage in emotionally abusive conduct with impunity. *Lyman*, 10 A.3d at 714 (recognizing that "a civil action for intentional infliction of emotional distress may . . . be available to some victims" of emotionally abusive behaviors). Where, as in this case, a romantic couple is involved in an intimate working relationship where one party allegedly has, and expressly insists on having and exerting, control over the other party's job responsibilities and performance, the potential is even greater that emotionally abusive conduct could reasonably be viewed as extreme and outrageous. For instance, the supervising party can exploit in the workplace vulnerabilities and insecurities learned during the romantic relationship and vice versa. Viewing the evidence most favorably to Plaintiff as the nonmoving party, one interpretation of the facts in this case is that after one ultimately unsuccessful attempt to remove Plaintiff from the company, Kjaer engaged in emotionally abusive conduct that was intended to demean and intimidate Plaintiff at home and at work at least in part to assume control of and remove Plaintiff from a business enterprise that was largely conceived by Plaintiff.

51

While the Law Court's discussion in *Lyman* provides some guidance, significantly, the Law Court did not find that the defendant's emotionally abusive conduct during years of a domestic relationship was not extreme and outrageous. Rather, the Court concluded that the plaintiff had not established that the alleged emotional distress was so severe that no reasonable person could be expected to endure it. *Id.* Therefore, *Lyman*—which did not involve a concurrent working relationship that included alleged abusive conduct—does not support Defendants' argument that as a matter of law, the alleged conduct in this case cannot be considered extreme and outrageous.

Based on a review of the summary judgment record, which includes Kjaer's alleged conduct over a sustained period in the context of the parties' multi-faceted employment and romantic relationship, the Court concludes that the facts Plaintiff has presented could support an extreme and outrageous finding. In other words, it is for a jury to determine whether the conduct was "sufficiently extreme and outrageous to result in liability." *Hinkley v. Baker*, 122 F. Supp. 2d 57, 61 (D. Me. 2000) (quotation marks and citation omitted).

### 2.    Severe Emotional Distress

Under Maine law, a plaintiff seeking to establish severe emotional distress must ordinarily provide evidence of "objective symptomology," – i.e., physical manifestations of the emotional harm, "such as shock, illness, or other bodily harm," unless the defendant's conduct was "unquestionably outrageous." *Lyman*, 10 A.3d at 712-13 & n.3 (quotation marks omitted). When the existence of severe emotional distress "cannot be inferred from the extreme and outrageous nature of the defendant's conduct alone," proof

52

of objective symptoms ordinarily requires expert testimony to show that plaintiff's emotional suffering "qualifies for a diagnosis such as shock, post-traumatic stress disorder, or some other recognized medical or psychological disease or disorder." *Id.* at 713. The harm to the plaintiff must be "so severe that no reasonable person could be expected to endure it[.]" *Id.*

In evaluating the severity of the alleged harm, the intensity and duration of the harm are factors to be considered. *Deane*, 322 A.3d at 1238 (citing Restatement (Third) of Torts § 46 cmt. j). "Stress, humiliation, loss of sleep, and anxiety occasioned by the events of everyday life are endurable and therefore insufficient." *Id.* (quotation marks and citations omitted). For example, the element of severe emotional distress is not met by allegations that consumers suffered stress, anxiety, depression, and fear based on concerns that their power could be disconnected in winter. *Id.* at 1238-39.

Unlike the record in *Lyman*, the record here includes evidence that Plaintiff sought treatment and was diagnosed with PTSD in the spring of 2023, and that her mental anguish was accompanied by physical manifestations of suffering. *Cf. Lyman*, 10 A.3d at 714. As discussed further below, the causal relationship between the PTSD diagnosis and Kjaer's actions is supported by expert opinion.

Consistent with the expert evidence, Plaintiff was diagnosed with PTSD around the time that the relationship between Plaintiff and Kjaer was deteriorating for a second time, and around the time that the two were in discussions with counsel negotiating the May Agreement, when Plaintiff believed that she was being ousted from the business for a second time. From the spring through the fall of that year, the objective physical symptoms

53

of Plaintiff's emotional suffering included nausea, shaking, panic attacks, broken blood vessels in her eyes, bleeding gums in the wake of stressful situations, and becoming stuck in a frozen state.  Plaintiff's counsel came to believe that Plaintiff might be suicidal, and one of her close friends described her as "a completely different person."  Plaintiff's emotional distress also affected her ability to function, resulting in her request for permission to work from home.  When the record and all reasonable inferences therefrom are considered in the light most favorable to Plaintiff, a reasonable factfinder could conclude that Plaintiff suffered emotional distress so severe that no reasonable person could be expected to endure it.

### 3.    Causation

"To withstand summary judgment on an IIED claim, a plaintiff must present facts tending to show that . . . the actions of the defendant caused the plaintiff's emotional distress[.]" *Champagne v. Mid-Maine Med. Ctr.*, 711 A.2d 842, 847 (Me. 1998).  In this context, the standard of factual cause applies.  Restatement (Third) of Torts § 26.  Tortious conduct "is a factual cause of harm when the harm would not have occurred absent the conduct." *Id.*

Plaintiff's designated experts have expressly linked Plaintiff's diagnosis of PTSD to Kjaer's conduct both at work and at home.  (Bentsen Dep. Ex. 3 at 1, ECF No. 26-90; Heller Aff. ¶ 6.)  As such, Kjaer's insistence that there is no evidence of causation is

inaccurate.  Viewing the record in the light most favorable to Plaintiff, a reasonable jury could find that Kjaer's conduct caused Plaintiff severe emotional distress.[29]

## CONCLUSION

Following a review of the record and after consideration of the parties' arguments, for the reasons explained herein, the Court grants in part Defendants' motions for summary judgment and enters judgment in favor of Defendants on Plaintiff's disability discrimination claims (Counts II, VI), her unjust enrichment claim (Count VIII), and her claim based on an alleged violation of Maine's wage and hour laws (Count IX).[30]  The Court also grants Defendant Kjaer's motion for summary judgment on the MWPA claim asserted in Count I.  The Court otherwise denies Defendants' motions.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 16th day of March, 2026.

---

[29] Kjaer's argument that Plaintiff's claim fails because she suffered emotional distress prior to her release of claims in 2021 is unavailing.  The record does not compel the conclusion that the release operates as a total bar to liability for IIED based on Kjaer's post-release conduct that bears some similarity to the pre-release conduct.  Whether Kjaer's post-release conduct caused the emotional distress Plaintiff suffered is a question of fact properly left for trial.

[30] In her response to ElleVet's motion for summary judgment, Plaintiff agreed that summary judgment was appropriate on Counts VIII and IX.